PUBLISH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---------------
No. 97-6289
---------------

D. C. Docket No. 1:96-CR-00188-001

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WALTER MOSQUERA GUAPI,
a.k.a. Guapi Lebron, Jr.,
a.k.a. Alfonso Medina Saaverdra,
a.k.a. Walter Mosquera,

Defendant-Appellant.

---------------
Appeal from the United States District Court for the
Southern District of Alabama
---------------
**(June 29, 1998)**

Before HATCHETT, Chief Judge, RONEY and CLARK, Senior Circuit Judges.

RONEY, Senior Circuit Judge:

This appeal challenges the legality of a warrantless search of all carry-on luggage on a Greyhound bus. The search revealed cocaine in the defendant's luggage. The district court found the search to be constitutional because the defendant consented to the search. Although defendant did indeed consent in this case, under the circumstances in which the consent was obtained, it was not an uncoerced, voluntary consent as is required to validate such a warrantless search. Therefore,

we reverse the conviction and hold that this search violated the Fourth Amendment's protection against unreasonable searches and seizures.

The police officers conducting this search did not inform the passengers that they were not required to consent to the search. Although we reject the notion of a *per se* rule requiring bus passengers to be informed of their constitutional rights, the facts and circumstances of this search required some indication to passengers that their cooperation was voluntary rather than mandatory. Because no such indication was provided, and because a reasonable person traveling in this bus would not have felt free to ignore the search request, we hold that this search was unconstitutional.

On September 14, 1996, a Greyhound bus en route from Houston to Miami made a scheduled stop in Mobile, Alabama. The driver of the bus, Herbert Braggs, informed all passengers that they would be required to temporarily exit the bus at the Mobile terminal. Before passengers could depart, however, two members of the Mobile Police Department's Drug Interdiction Unit, one in full uniform and one in plain clothes, boarded the bus. Officer Marvin Whitfield, the uniformed officer, stood at the front of the bus and made the following announcement:

> I'm Officer Marvin Whitfield with the Mobile Police Department Drug interdiction Unit. With your cooperation, I'd like to check on-board cargo for illegal contraband such as alcohol, narcotics, weapons, or explosives. With your consent and cooperation, I'd like to ask you to bring down your on-board luggage if you have any overhead and have it open so I can do a quick on-board inspection.

Officer Whitfield did not inform the passengers that they could refuse to consent to the search, or that they could simply leave the bus with their luggage. While Braggs, the bus driver, went into the terminal to complete his paperwork, Officer Whitfield and his partner, a plain-clothes female officer, waited for the passengers to bring down and open their bags. Officer Whitfield then proceeded down the aisle of the bus, beginning from the front, while his partner waited in the area normally

2

occupied by the bus driver. As he walked down the aisle, Officer Whitfield inspected each passenger's opened bag for contraband items. When he had finished searching the individuals seated in a particular row and moved on to the next row of seats, the passengers who had just been searched were free to exit the bus.

Along with all of the other passengers on the bus, Walter Mosqueri Guapi retrieved his carry-on luggage from the overhead storage bin and held it open for Officer Whitfield's inspection. Officer Whitfield did not speak with Guapi, but he looked under some clothing in Guapi's bag and saw a brick-like form which he believed might be narcotics. Officer Whitfield asked Guapi if the brick-like form was contraband and the defendant responded affirmatively. At this point, Officer Whitfield asked Guapi to exit the bus with him. Outside the bus, Officer Whitfield placed Guapi's carry-on bag among the checked luggage in a roped-off cargo area and instructed his trained narcotics dog to conduct a sniff test. The canine alerted on Guapi's bag, Guapi admitted that there was cocaine in the bag, and Officer Whitfield placed Guapi under arrest.

In *Florida v. Bostick*, the Supreme Court reversed a Florida Supreme Court decision which adopted a *per se* rule prohibiting police from randomly boarding buses and questioning passengers as a means of drug interdiction. *Florida v. Bostick*, 501 U.S. 429 (1991). The Supreme Court had previously held that the Fourth Amendment permits officers to approach individuals at random in airport lobbies and other public places to ask questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate. *See Florida v. Royer*, 460 U.S. 491, 502 (1983); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In *Bostick*, the Court simply held that rule applies equally to police encounters that take place on buses. It rejected the "free to leave" rubric that has been articulated for street encounters

3

because a passenger may well not want to leave the bus because he or she wants to go when the bus goes, so that factors other than the police encounter would dilute the application of the "free to leave" determination. It held that the appropriate inquiry is whether under "all the circumstances surrounding the encounter . . . the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. It held that the fact the encounter is in the cramped confines of a bus is but one factor to be taken into consideration, rather than the sole consideration given by the Florida court.

In *Bostick*, the Supreme Court found two facts "particularly worth noting. First, the police specifically advised Bostick that he had the right to refuse consent. . . . Second, at no time did the officers threaten Bostick with a gun." *Bostick*, 501 U.S. at 432. In this case, although Officer Whitfield did not threaten Guapi with a gun, he also did not inform Guapi that he had a right to refuse consent. In both of our prior reported bus search cases, the police officers involved also specifically informed individual passengers that they had a right to refuse any search and that cooperation with law enforcement efforts was voluntary. *United States v. Fields*, 909 F.2d 470, 472 (11th Cir. 1990); *United States v. Hammock*, 860 F.2d 390, 392 (11th Cir. 1988).

The Supreme Court has steadfastly rejected the notion of imposing *per se* rules on police officers conducting warrantless searches. *See Ohio v. Robinette*, 117 S. Ct. 417, 421 (1996); *Bostick*, 501 U.S. at 435-37 (1991). The Court has specifically rejected the notion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). It is enough that the circumstances themselves would indicate that the search can proceed only if consent is

4

given. Looking at the circumstances of this case, we feel that a reasonable person in the defendant's position would not have felt free to disregard Officer Whitfield's requests without some positive indication that consent could have been refused.

The district court erred when it adopted the magistrate judge's report finding that a reasonable person would have felt free to decline Officer Whitfield's requests under these circumstances. The magistrate judge's report and recommendation stated that "independent factors (such as the cramped confines of a crowded bus) should not weigh in the Court's calculus," and concluded as a matter of law that "Officer Whitfield did not touch or grab Defendant, block his path of egress, or retain something of value from him. . ." and that "a reasonable person in Defendant's position would have felt free to decline the officer's request." This incorrectly states the law, and erroneously applies the law to the facts of this case.

The district court was incorrect when it stated that it was irrelevant that this encounter took place on a bus. The Supreme Court in its *Bostick* opinion specifically stated that "[w]here the encounter takes place" is a factor to consider, *Bostick*, 501 U.S. at 437, and our own precedent also requires district courts to examine the constitutionality of bus searches in light of the unique circumstances inherent in that particular mode of transportation. *See Fields*, 909 F.2d at 474; *Hammock,* 860 F.2d at 393. As this case graphically illustrates, the cramped confines of a bus create an environment uniquely susceptible to coercive police tactics. Furthermore, police must do more than simply avoid a laundry list of the most egregiously abusive police tactics, such as threatening or assaulting passengers or confiscating valuable personal items, in order to avoid illegally seizing a citizen exercising the constitutional right to interstate travel. To the contrary, police must behave

in a manner calculated to convey to a reasonable person that cooperation with law enforcement is voluntary.

In sharp contrast to the Broward County Sheriff's Office search procedure upheld in *Bostick*, *Hammock* and *Fields*, Officer Whitfield's search showed little or no effort to convey to passengers that their cooperation was voluntary. It was carefully designed to convince passengers that they had no choice but to accede to Officer Whitfield's demands. The most glaring difference between the search in this case and the searches upheld in *Bostick*, *Fields* and *Hammock* is the complete lack of any notification to the passengers that they were in fact free to decline the search request. While we eschew the notion of a *per se* rule requiring bus passengers to be informed of their constitutional rights prior to a search, the absence of such a notice is an important factor in this case. Providing a simple notification to bus passengers that they are free to decline a search is perhaps the most efficient and effective method to ensure compliance with the Constitution. Because no such notice was given in this case, we look to the other circumstances surrounding the search, and conclude that Officer Whitfield's search was constitutionally unreasonable.

Upon arrival in Mobile, and before Officer Whitfield had boarded, Herbert Braggs, the driver of the bus, had informed passengers that they would be required to exit the bus. In *Bostick*, the court noted that a reasonable person in Bostick's position would not have wanted to leave because he had voluntarily confined himself to a departing bus. *Bostick*, 501 U.S. at 436. Guapi, on the other hand, had arrived at the gate and been instructed to disembark. As anyone who has experienced interstate travel on either a bus or an airplane knows, passengers are eager to depart as quickly as possible. The only reason the passengers on the Houston to Miami bus did not do so was because their exit was obstructed by two police officers.

6

After boarding the bus, Officer Whitfield made a general announcement to all passengers rather than approaching each passenger individually. During this announcement, Braggs – the only other potential figure of authority – exited the bus, and the police officers assumed his position in the front of the bus. Officer Whitfield apparently made his announcement very quickly. While testifying to the wording of his announcement at the suppression hearing, the court reporter had to interrupt Officer Whitfield three times in order to understand what he was saying. Upon arrival in Mobile, then, a passenger is faced with the following scenario. The bus driver exits and is replaced by a uniformed police officer who rapidly announces something about a search, and then waits for everyone to get their bags down and hold them open for inspection. This is a far cry from the "voluntary" and "cooperative" police encounters contemplated by the Fourth Amendment, and no reasonable person would think otherwise. It is not unusual to be approached by a fellow traveler on a bus or in an airport, and therefore there is no reason to believe that when police officers engage in similar behavior that they are coercing or intimidating citizens. The same cannot be said of a uniformed person making an announcement at the front of a Greyhound bus. The unambiguous message is that the attention and cooperation of all passengers is required.

In addition, while passengers voluntarily place themselves in a confined space when riding in a bus, Officer Whitfield's search was carefully designed to aggravate those circumstances. Instead of beginning his search in the rear of the bus, which would have permitted those passengers who felt uncomfortable with the procedure to exit without confronting the police, or waiting until passengers had already exited the bus, Officer Whitfield stood in front of each passenger he searched. Although the district court stated that Officer Whitfield did not "block [the defendant's] path of egress," this finding was clearly erroneous. As the government essentially conceded at oral

7

argument, any fair interpretation of the briefs and the record shows that the police officers blocked the aisle of the bus in a way that would have required any passenger who preferred to ignore the police presence to physically confront the officers.

Finally, the testimony at Guapi's suppression hearing reinforces our opinion that a reasonable person in these circumstances would not have felt free to ignore Officer Whitfield's requests. At oral argument, the government was not able to provide us with any data on the ratio of passengers who decline to participate in Officer Whitfield's searches, so we must rely on the transcript of the hearing to provide a fair picture of passenger reaction. In this regard, Officer Whitfield testified that although he had been searching "from 28 on up of searches of individual buses"per week, he could only recall "several times" in which individuals had refused his search requests. It is undisputed that in the instant circumstances no passengers refused the search. Perhaps most significantly, there was the testimony of Daniel R. Stankowski, an investigator for the Federal Defender's Office and 29-year-veteran of the F.B.I. Because Herbert Braggs, the bus driver, was not available to testify at the suppression hearing, Stankoski testified to an interview of Braggs he had conducted. According to Stankowski, Braggs, who had observed several of these searches, described the procedure as follows:

> A: He stated it was their normal procedure that if the passengers were about to get off that the officers would instruct them to get back in their seats, to take their seats, and that a search was going to be conducted.
>
> Q: Was he – did he relate to you whether or not he thought the passengers could get off the bus once the search had begun?
>
> A: It was his impression, and he relayed that to me, that he thought the passengers could not come off the bus.

8

Although we accept as not clearly erroneous the district court's implicit finding that passengers could in fact have exited the bus, we find the bus driver's opinion significant because it shows how a reasonable individual was likely to feel when confronted with Officer Whitfield's requests.

Under these circumstances, we find that a reasonable person in Guapi's position would not have felt free to decline Officer Whitfield's request to search on-board luggage, and that therefore Guapi had already been unconstitutionally seized before Officer Whitfield found the cocaine in his bag. The district court erred in denying Guapi's motion to suppress the cocaine evidence.

**REVERSED AND REMANDED.**