PUBLISH

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---------------
No. 97-2146
---------------

D. C. Docket No. 96-111-CR-J-99(S)

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/28/98
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE WASHINGTON,

Defendant-Appellant.

---------------
Appeal from the United States District Court for the
Middle District of Florida
---------------
**(August 28, 1998)**

Before COX and BLACK, Circuit Judges, and RONEY, Senior Circuit Judge.

RONEY, Senior Circuit Judge:

In this warrantless search of passengers traveling on an interstate bus, the government relies upon the consent of the searched passengers to obviate the need for a warrant. After the district court denied the defendant's motion to suppress evidence obtained during the search, the defendant was convicted at a bench trial of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). The only issue before us is whether the consent given by the defendant for the search was uncoerced and legally voluntary. We hold that it was not and vacate the

conviction.  In the discussion of this case, we parallel our opinion in a similar a case heard by a different panel, *United States v.  Guapi*, 144 F.3d 1393 (11th Cir.  1998).

The federal agents conducting this search did not inform the passengers that they were not required to consent to the search.  Although we reject the notion of a *per se* rule requiring bus passengers to be informed of their constitutional rights, the facts and circumstances of this search required some indication to passengers that their cooperation was voluntary rather than mandatory.  Because no such indication was provided, and because a reasonable person traveling on this bus would not have felt free to ignore the search request, we hold that this search was unconstitutional.

For purposes of this appeal, we accept the findings of fact in the magistrate judge's report, and we interpret the record in the light most favorable to the government.  At 6:50 on the morning of August 5, 1996, two federal agents boarded a Greyhound bus making a scheduled stop in Jacksonville, Florida.  The bus was scheduled to depart at 7:00, and the driver was still in the bus station.  Special Agent Bruce Dean Savell of the Drug Enforcement Administration went to the rear of the bus, and Agent James Andrew Perkins of the United States Border Patrol stood at the front of the bus.  Both agents were casually dressed, and their weapons were concealed in fanny packs.  Agent Perkins held his credentials and his badge over his head and made the following announcement:

> Good morning, ladies and gentlemen.  My partner and I are both federal agents
> with the United States Department of Justice.  No one is under arrest or anything
> like that, we're just conducting a routine bus check.  When we get to you, if we
> could please see your bus ticket, some photo identification if you have some with
> you, please, and if you would please identify which bag[] is yours on the bus we'd
> appreciate it and we'll be out of your way just as quick as we can.

Agent Perkins joined Agent Savell at the rear of the bus and they began making their way forward, questioning passengers and asking them if they were carrying "drugs, weapons, large sums of money or firearms." The agents were careful to stand behind each passenger and not block the aisles of the bus as they conducted their sweep. The record is unclear if any passengers other than the defendant were actually searched.

Willie Washington was sitting in the rear half of the bus on the driver's side. He was sitting in a window seat, and the aisle seat next to him was vacant. When Agent Perkins reached him, Washington handed Agent Perkins a one-way ticket from Miami to Bamberg, South Carolina, and a Georgia driver's license. When Agent Perkins asked the defendant where he lived, the defendant informed him that he lived in Miami. Washington also informed the agents that he was not carrying any contraband with him. When Agent Perkins asked the defendant to identify his luggage, Washington indicated a maroon bag on his lap. Agent Perkins asked Washington if he could search the maroon bag, and Washington told him that it was alright and handed him the maroon bag.

As he handed the maroon bag to Agent Perkins, Washington reached over and retrieved a white plastic bag from the floor and placed this bag on his lap. He hunched over his lap and began moving his left hand under the plastic bag. Agent Perkins was suspicious of Washington's behavior. He asked Washington if Agent Savell could search the maroon bag, and when the defendant consented, he handed the maroon bag to Agent Savell, who was standing behind Agent Perkins. Agent Perkins asked Washington what was in the white plastic bag. Washington told him that it contained potato chips and a soda. Agent Perkins asked for consent to search the white plastic bag, and Washington handed it to him. Washington continued to

3

crouch over, covering his lap as he gave Agent Perkins the white plastic bag. Agent Perkins then noticed a tubular bulge extending underneath Washington's pants beyond the normal length of a pants pocket. Agent Perkins asked Washington if he could search his person, and Washington consented. Agent Perkins felt the bulge underneath Washington's pants and found the bulge to be consistent with previous seizures of cocaine and heroin he had made. He also noticed other similar bulges concealed underneath Washington's pants. At this point, Agent Perkins placed Washington under arrest and escorted him off the bus. After conducting a more thorough search outside the bus, Agent Savell discovered $3,500 worth of powder cocaine in six tubular packages concealed in a homemade "apron" Washington wore underneath his pants.

In *Florida v. Bostick*, the Supreme Court reversed a Florida Supreme Court decision which adopted a *per se* rule prohibiting police from randomly boarding buses and questioning passengers as a means of drug interdiction. *Florida v. Bostick*, 501 U.S. 429 (1991). The Supreme Court had previously held that the Fourth Amendment permits officers to approach individuals at random in airport lobbies and other public places to ask questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate. *See Florida v. Royer*, 460 U.S. 491, 502 (1983); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In *Bostick*, the Court simply held that the rule applies equally to police encounters that take place on buses. It rejected the "free to leave" rubric that has been articulated for street encounters because a passenger may well not want to leave the bus because he or she wants to go when the bus goes, so that factors other than the police encounter would dilute the application of the "free to leave" determination. It held that the appropriate inquiry is whether under "all the circumstances surrounding the encounter . . . the police conduct

4

would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id*. at 439 (1991). It held that the fact the encounter is in the cramped confines of a bus is but one factor to be taken into consideration, rather than the sole consideration given by the Florida court.

In *Bostick*, the Supreme Court found two facts "particularly worth noting. First, the police specifically advised Bostick that he had the right to refuse consent. . . . Second, at no time did the officers threaten Bostick with a gun." *Bostick*, 501 U.S. at 432. In this case, although Agent Perkins did not threaten Washington with a gun, he also did not inform Washington that he had a right to refuse consent. In both of our reported bus search cases prior to *Quapi*, the police officers involved also specifically informed individual passengers that they had a right to refuse any search and that cooperation with law enforcement efforts was voluntary. *United States v. Fields*, 909 F.2d 470, 472 (11th Cir. 1990); *United States v. Hammock*, 860 F.2d 390, 392 (11th Cir. 1988).

The Supreme Court has steadfastly rejected the notion of imposing *per se* rules on police officers conducting warrantless searches. *See Ohio v. Robinette*, 117 S. Ct. 417, 421 (1996); *Bostick*, 501 U.S. at 435-37 (1991). The Court has specifically rejected the notion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). It is enough that the circumstances themselves would indicate that the search can proceed only if consent is given. Looking at the circumstances of this case, we feel that a reasonable person in the defendant's position would not have felt free to disregard Agent Perkins' requests without some positive indication that consent could have been refused.

5

The Constitution does not permit police officers, without probable cause or reasonable suspicion, to restrain the liberty of American citizens. The well-established test is that if, by physical force or show of authority, a reasonable citizen would not believe that he is free to ignore police questioning and go about his business, he has been unconstitutionally seized. *Bostick,* 501 U.S. at 439; *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). There is no doubt in this case that the encounter began with a "show of authority," because Agent Perkins held his badge above his head and identified himself as a federal agent. He announced what he wanted the passengers to do, and what he was going to do. Absent some positive indication that they were free not to cooperate, it is doubtful a passenger would think he or she had the choice to ignore the police presence. Most citizens, we hope, believe that it is their duty to cooperate with the police.

Unlike the searches in *Robinette* and *Schneckloth*, in this case the agents conducting the search stated no legitimate reason to detain any passengers on the bus. In both *Robinette* and *Schneckloth*, police obtained consent to search a vehicle only after lawfully detaining the occupants pursuant to a traffic stop. *See Robinette*, 117 S. Ct. at 421; *Schneckloth*, 412 U.S. at 220.

It seems obvious to us that if police officers genuinely want to ensure that their encounters with bus passengers remain absolutely voluntary, they can simply say so. Without such notice in this case, we do not feel a reasonable person would have felt able to decline the agents' requests.

6

At  the suppression hearing, the defendant here testified that "in a way I was like about a citizen, like respect the police.  If they ask you for something, order, I was following they order, just being a citizen, respecting the law."  While we understand that the test is objective, a reasonable person sitting in the defendant's position should feel the same way.  This search, conducted in the cramped quarters of an interstate bus, was consciously designed to take full advantage of a coercive environment. A federal agent boarded a bus, held a badge over his head, and asked to see the defendant's ticket and identification.  Then the agent asked to search the defendant's belongings and person.  Under these circumstances, the typical bus passenger would not feel free to refuse the requests, but would consider these "requests" to be orders backed by the full force of the United States government.  Therefore, we hold that this search violated the Fourth Amendment's prohibition against unreasonable searches and seizures.

**VACATED AND REMANDED.**

BLACK, Circuit Judge, dissenting:

In my view, the majority opinion establishes a *per se* rule that authorities must notify bus passengers of the right to refuse consent before questioning those passengers and asking for consent to search luggage. The Supreme Court has consistently rejected *per se* rules in the Fourth Amendment context. *See, e.g., Ohio v. Robinette*, 519 U.S. 33, 117 S. Ct. 417 (1996), and *Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382 (1991). In *Bostick*, 501 U.S. at 439-40, 111 S. Ct. at 2389, the Supreme Court noted that Fourth Amendment challenges are judged by the totality of the circumstances surrounding the encounter and accordingly determined that the Florida Supreme Court erred by adopting a *per se* rule that searches are unconstitutional solely because they take place within the confines of a bus. In *Robinette*, the Court rejected a *per se* rule that officers must inform a lawfully seized defendant of his right to refuse before asking for consent to search his vehicle as antithetical to the "traditional contextual approach." *Robinette*, 519 U.S. at __, 117 S. Ct. at 421. Although it acknowledges the Supreme Court's admonition against *per se* rules, I suggest the majority opinion conflicts with that principle.

The majority draws a parallel between this case and *United States v. Guapi*, 144 F.3d 1393 (11th Cir. 1998), another bus search case. In that case, the bus driver informed the passengers, as the bus made a scheduled stop, that they would be required to exit the bus temporarily. Before the passengers could do so, two officers boarded the bus. One of the officers was in uniform. The uniformed officer announced that they wished to check on-board cargo for contraband and announced to the passengers that he would like for them to open their on-board luggage for visual inspection. The uniformed officer began conducting the searches from the front of the bus. The officer blocked the aisle as he conducted the searches, so passengers who had not been searched did not have a clear path to exit the bus. While the

8

uniformed officer conducted the searches, the second officer remained at the front of the bus. The *Guapi* Court determined that a reasonable person in the position of the defendant in that case would not feel free to refuse consent to search his luggage. The Court accordingly held that the search was conducted in violation of the Fourth Amendment. I agree with the *Guapi* Court's conclusion. The totality of the circumstances in that case created the impression that a passenger would be prevented from exiting the bus until he complied with the officers' request to search his luggage.

This case presents facts that are very different from those in *Guapi*. In this case, the officers conducted the search from the back of the bus moving forward, thereby leaving the aisle free for ingress and egress. Neither of the officers was in uniform. Both officers remained behind the passengers as they questioned them. There was no law enforcement officer at the front of the bus. Furthermore, the officers asked each passenger only for his ticket and identification; both of those items were returned immediately to the passenger after inspection. The officers asked Washington individually for consent to search his luggage; there was no instruction for all passengers to open their luggage and no indication that compliance was a requirement for egress from the bus.

Short of telling the passengers of the right to refuse consent, it is difficult to conceive of any actions these officers could have taken to make this search any more reasonable. With this case as precedent, it is not clear that there will ever be any set of circumstances under which this Court can uphold a bus search if the officers do not inform the passengers of the right to refuse consent. In my view, the majority opinion makes notification of the right to refuse consent a

9

requirement for a valid bus search.  Although this may be a good policy, it departs from the

spirit, if not the letter, of *Bostick* and *Robinette*.  For this reason, I respectfully dissent.