PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
01/27/2000
THOMAS K. KAHN
CLERK

----------------------------------------
No. 98-2100
----------------------------------------

D. C. Docket No. 97-00120-CR-J-21B

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

     versus

RUVEL ALFRED SMITH, JR., a.k.a. Rube Smith, etc.,

                                        Defendant-Appellant.

-------------------------------------------------------------------
Appeal from the United States District Court
for the Middle District of Florida
-------------------------------------------------------------------

**(January 27, 2000)**

Before EDMONDSON and MARCUS, Circuit Judges, and STROM*, Senior District Judge.

_____

\*      Honorable Lyle E. Strom, Senior U.S. District Judge for the District of Nebraska, sitting by designation.

EDMONDSON, Circuit Judge:

Defendant, Ruvel Alfred Smith, Jr., appeals his convictions for conspiring to distribute cocaine and possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846. Defendant asserts that the district court erred in denying Defendant's motion to suppress. We affirm.

BACKGROUND

This case arises from a bus check at a Jacksonville, Florida, bus station. On 5 May 1997, DEA Special Agent Bruce Savell and Border Patrol Agent James Perkins were conducting narcotics-interdiction surveillance at the bus station. Savell, inside the bus terminal, noticed Defendant's co-indictee, Joseph Tee Bruton. According to Savell, Bruton constantly changed seats, walked around, and scanned the terminal. Bruton watched every passenger who walked through the terminal. Bruton appeared nervous. Savell also noticed two new, hard-sided, suitcases sitting unattended in the terminal. The suitcases appeared to be expensive. Savell observed Bruton and the suitcases for approximately forty minutes.

At some point, Bruton met with Defendant inside the terminal. The two men engaged in a quick, whispered conversation. Defendant and Bruton then turned

2

away from each other and walked in opposite directions. After this exchange, Savell began to observe Defendant. Savell noted that Defendant also walked around the terminal, switched seats, and went in and out of the terminal.

Soon thereafter, Bruton sat down with the previously unattended suitcases between his legs. A boarding announcement was made for a northbound bus, and Bruton picked up the suitcases and walked toward the boarding gate. As he approached the gate, Bruton slid one suitcase across the terminal floor to Defendant. Bruton and Defendant each carried one suitcase through the gate.

Agent Savell waited for about four minutes and then went through the boarding gate. Savell saw the two suitcases in the undercarriage of the bus. He checked the baggage tags attached to the suitcases; the tags revealed that the suitcases belonged to a "Mr. Pender" and had originated in Miami, Florida.

At that point, based on his training and experience,[1] Savell suspected that Defendant and Bruton were carrying drugs in the suitcases.[2] Savell requested and

---

[1] At the time of this incident, Savell had been a DEA agent for six years. During those six years, Savell had conducted surveillance and searches at bus stations on hundreds of occasions.

[2] Savell testified that his suspicion was based on several considerations, including Bruton's scanning the terminal and other bus passengers, Defendant and Bruton's nervous behavior, their whispered conversation, and their leaving the suitcases unattended for more than half an hour in the terminal. Savell testified that, in his experience conducting drug-interdiction at the bus station, drug couriers frequently leave their narcotics-laden luggage unattended until immediately before boarding.

obtained the bus driver's permission to board the bus and to conduct a bus check.

Savell and Perkins, although dressed in plainclothes, displayed their badges as they

boarded the bus. The agents' firearms were concealed. Perkins announced to the

passengers:

> Good morning, ladies and gentlemen, my partner and I are both
> federal agents of the United States Department of Justice. Nobody is
> under arrest or anything like that, we're just conducting a routine
> public transportation safety check. When we get to you, if you would
> please show us your bus ticket, some photo identification, if you have
> some with you, please. And, most importantly, if you would identify
> which bags are yours on the bus, we'd appreciate it, and we'll be out
> of your way real quick.

Neither Savell nor Perkins expressly informed the passengers that their cooperation

was voluntary. The agents then, beginning in the back of the bus and making their

way forward, spoke individually with each passenger. The agents, in addition to

inspecting each passenger's ticket and identification, asked each passenger whether

the passenger was carrying weapons, drugs, or large amounts of money. The

agents stood behind each passenger and did not block the aisle of (or exit from) the

bus as they conducted their bus check. The check of passengers failed to reveal a

"Mr. Pender" aboard the bus.

When approached by the agents, Defendant offered a one-way ticket from

Miami to Charleston, South Carolina, and a driver's license for the agents'

inspection. Bruton also displayed a ticket from Miami to Charleston; Bruton said

4

that he was carrying no identification. Defendant and Bruton each denied that he was carrying drugs or weapons, that he had checked luggage, and that he was traveling with anyone. Defendant and Bruton permitted the agents to search their carry-on luggage. The agents frisked Defendant and Bruton, but they found no weapons.

After the agents completed their survey of the passengers, Savell retrieved the two pertinent suitcases from the undercarriage and brought them aboard the bus. Savell asked whether a passenger claimed ownership of the suitcases. No passenger claimed to own the suitcases. Savell then directly asked Defendant and Bruton, individually, whether they owned the suitcases. Both Defendant and Bruton denied ownership of the suitcases.

Savell and Perkins, assisted by two Florida Highway Patrolmen, then opened the suitcases. The agents discovered eleven kilograms of cocaine in the suitcases. Defendant and Bruton were arrested.[3] After making the arrests, the agents discovered a bus ticket in the name of "Pender" concealed in a seat near Defendant and Bruton.

Defendant moved the district court to suppress certain evidence, including the cocaine found in the suitcases, the Pender ticket, and various statements made

---

[3] Bruton pled guilty and later testified against Defendant at trial.

by Defendant. Defendant argued that the discovery of all of this evidence flowed from the agents' check of bus passengers. Defendant asserted that the bus check was an unlawful seizure of the bus passengers in violation of the Fourth Amendment. Thus, Defendant contended, the evidence should be suppressed as "fruits of the poisonous tree." The district court disagreed, however, concluding that the bus check did not amount to a "seizure." The district court accordingly denied Defendant's motion to suppress. Defendant was tried by jury and convicted. Defendant appeals.


DISCUSSION


Defendant contends that the district court erred in denying his motion to suppress because: (1) the bus check was a "seizure" within the meaning of the Fourth Amendment; (2) the seizure was not reasonable and violated the Fourth Amendment; and (3) the fruits of the seizure, therefore, must be suppressed. We accept Defendant's first contention: Circuit precedent mandates the conclusion that the bus check was a "seizure." We, however, conclude that the agents' seizure

of Defendant aboard the bus was reasonable under the Fourth Amendment.[4]  The

district court, therefore, did not err in denying Defendant's motion to suppress.


1.      WHETHER THE BUS CHECK WAS A "SEIZURE"


A well-established principle of Fourth Amendment jurisprudence is that a

seizure does not occur just because a police officer approaches a person and asks

the person a few questions. Florida v. Royer, 103 S. Ct. 1319, 1324 (1983).  The

Supreme Court, accordingly, has said that a bus check, where government agents

board a bus and ask questions of the passengers, is not necessarily a seizure.

Florida v. Bostick, 111 S. Ct. 2382, 2387-88 (1991).  Instead, "the crucial test is

whether, taking into account all of the circumstances surrounding the encounter,

the police conduct would 'have communicated to a reasonable person that he was

not at liberty to ignore the police presence and go about his business.'"  Id. at 2387.

In United States v. Washington, 151 F.3d 1354 (11th Cir. 1998), this court

considered the propriety of a bus check conducted in a manner nearly identical to

---

[4] Because we conclude that the bus check was reasonable under the Fourth Amendment, we need not consider the Government's alternative contention that, even if the bus check was an unreasonable seizure, the fruits of the bus check are nonetheless admissible under the inevitable discovery doctrine.  See generally, Nix v. Williams, 104 S. Ct. 2501, 2509 (1984) (adopting inevitable discovery exception to exclusionary rule).

7

the bus check in this case (and, involving the same officers). In that case, the two officers, casually dressed and with their weapons concealed, boarded a bus at the Jacksonville bus station. The officers displayed their badges and announced:

> Good morning, ladies and gentlemen. My partner and I are both federal agents with the United States Department of Justice. No one is under arrest or anything like that, we're just conducting a routine bus check. When we get to you, if we could please see your bus ticket, some photo identification if you have some with you, please, and if you would please identify which bag[] is yours on the bus we'd appreciate it and we'll be out of your way just as quick as we can.

Id. at 1355. The officers went to the rear of the bus and began working their way forward, speaking individually with each passenger and asking them if they were carrying "drugs, weapons, large sums of money, or firearms." Id. The officers stood behind each passenger as they spoke and did not block the passenger's access to the aisle of the bus. Neither officer told the passengers that their cooperation was voluntary. Id. at 1355-56. The court decided that, under those particular circumstances, the bus check constituted a "seizure." Id. at 1357.

We see no important distinction between the conduct of the bus check in this case and the conduct of the bus check in Washington. "[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." United States v. Hogan, 986 F.2d

1364, 1369 (11th Cir. 1993).  Given the virtual identity of the essential facts, we,

therefore, are bound by the <u>Washington</u> court's decision on the question of

seizure.[5]  Overcome by precedent, we must conclude that the bus check in this case

amounted to a "seizure" within the meaning of the Fourth Amendment.


2.      WHETHER THE SEIZURE VIOLATED THE FOURTH AMENDMENT


Our conclusion that this bus check constitutes a seizure does not end our

inquiry, however.[6]  Instead, we must now examine whether the seizure was

reasonable under the Fourth Amendment.[7]  The temporary, investigative detention

---

[5] That <u>Washington</u> controls our determination that this bus check is a seizure does not mean that every bus check in this Circuit is a seizure.  As the Supreme Court has acknowledged, whether a bus check constitutes a seizure is a very fact-sensitive inquiry; for this very reason, the Supreme Court has rejected per se rules governing bus checks. <u>Bostick</u>, 111 S. Ct. at 2389.  But, because we find the facts of legal significance in this case identical to those in <u>Washington</u>, we conclude that <u>Washington</u> controls the seizure issue in this case.  <u>See generally</u>, <u>New Port Largo, Inc. v. Monroe County</u>, 985 F.2d 1488, 1500 n.7 (11th Cir. 1993) (Edmondson, J., specially concurring) (discussing precedential value of prior panel decisions).

[6] "The Fourth Amendment is not, of course, a guarantee against <u>all</u> searches and seizures, but only against <u>unreasonable</u> searches and seizures." <u>United States v. Sharpe</u>, 105 S. Ct. 1568, 1573 (1985) (emphasis in original).

[7] Although <u>Washington</u> resolves the question of whether this bus check was a "seizure," it is wholly inapposite to the second step of our inquiry:  given that a seizure occurred, whether the seizure was a reasonable one under the Fourth Amendment.  In <u>Washington</u>, it does not appear that the Government contended that (or that the court addressed whether), even if the bus check was a seizure, the seizure was nonetheless reasonable:  that is, the seizure was properly based upon the officers' reasonable suspicion or probable cause.  <u>See Washington</u>, 151 F.3d at 1357.  In this case, the Government, however, vigorously asserts that, even if the bus check was a seizure, it was a

9

of a person is constitutionally permissible if there exists, at the time of the detention, a reasonable suspicion that the person detained has been, is, or is about to be involved in criminal activity.[8] United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995). Because we conclude that such a reasonable suspicion existed, at the time of the bus check, the district court did not err in denying Defendant's motion to suppress.

Although reasonable suspicion "requires more than a hunch," id., "the requisite level of suspicion to make an investigative stop is 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" United States v. Glover, 957 F.2d 1004, 1009 (2d Cir. 1992) (quoting United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991)). In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention. United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996); United States v. Cruz, 909 F.2d 422, 424 (11th Cir.

---

constitutionally valid seizure.

[8]In general, a seizure is constitutionally infirm unless the seizing officer has probable cause. Lindsey v. Storey, 936 F.2d 554, 558 (11th Cir. 1991). Where, however, the seizure is brief and minimally intrusive--a temporary, investigative detention--the seizing officer only need have "a reasonable articulable suspicion based on objective facts that the person has engaged in criminal activity." United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995). Given the minimal degree of intrusiveness involved in the bus check in this case, we treat the bus check as a temporary, investigative detention, requiring only a reasonable suspicion. See id. at 1576-77.

1989).  And, we view the totality of the circumstances in the light of the officers' special training and experience.  United States v. Brignoni-Ponce, 95 S. Ct. 2574, 2582 (1975); see also United States v. Cortez, 101 S. Ct. 690, 695 (1981); United States v. Bowles, 625 F.2d 526, 533-34 (5th Cir. 1980).  We also bear in mind that behavior, seemingly innocuous to the ordinary citizen, may "appear suspect to one familiar with the practices of narcotics couriers."  Glover, 957 F.2d at 1010; see also United States v. Mendenhall, 100 S. Ct. 1870, 1882 (1980) (Powell, J., concurring); United States v. Gonzalez, 969 F.2d 999, 1004 (11th Cir. 1992).

In this case, given Agent Savell's training and experience, we conclude that the totality of the circumstances created a reasonable suspicion that Defendant and Bruton were engaged in criminal activity.  Defendant and Bruton both appeared nervous in the bus terminal.  See United States v. Cruz-Hernandez, 62 F.3d 1353, 1356 n.2 (11th Cir. 1995) (considering suspect's nervousness as factor contributing to reasonable suspicion).  Defendant and Bruton's whispered conversation in the bus terminal and their joint transportation of the suitcases made apparent that they were traveling together; yet, they waited separately in the bus terminal, before the boarding call, apparently attempting to conceal their association.  See Bowles, 625 F.2d at 534-35 (considering suspects' "efforts to hide association" in airport terminal as factor contributing to reasonable suspicion).  Defendant and Bruton left

11

their new, expensive suitcases unattended until immediately before boarding; Agent Savell testified that this is a common practice among drug couriers. See Brignoni-Ponce, 95 S. Ct. at 2582 ("In all situations, the officer is entitled to assess the facts in light of his experience in detecting [narcotics trafficking]."). The suitcases originated in Miami, a known "source city" for narcotics on the East Coast. See Bowles, 625 F.2d at 534 (finding fact that suspect was traveling from known drug source city "not an insignificant factor"). And, Bruton scanned and surveilled the terminal, watching every person who passed by him in the bus station. See Mendenhall, 100 S. Ct. at 1882 (Powell, J., concurring) (noting as factor in reasonable suspicion analysis that suspect "scanned the entire gate area"); see also United States v. Puglisi, 723 F.2d 779, 789 (11th Cir. 1984); Bowles, 625 F.2d at 535; United States v. Barnard, 553 F.2d 389, 391-92 (5th Cir. 1977).

We conclude that, at the time of the bus check, ample facts existed to give rise to a reasonable suspicion that Defendant and Bruton were involved in criminal activity. The temporary, investigative detention of Defendant aboard the bus, consequently, was reasonable under the Fourth Amendment. The district court, therefore, properly denied Defendant's motion to suppress. Defendant's convictions and sentence are AFFIRMED.

AFFIRMED.