**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 7 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

HOMERO C. TAPIA, a/k/a Omaro Tapia
Cardenas, a/k/a/ Homero Tapia-Cardenas,

    Defendant - Appellee.

No. 02-1028

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 00-CR-149-B)**

---

Elizabeth D. Collery, Attorney, Appellate Section, Criminal Division, Department of Justice (John W. Suthers, United States Attorney and David M. Gaouette, Assistant United States Attorney, Denver, CO, with her on the briefs) Washington, DC, for Plaintiff-Appellant.

Robert W. Pepin, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with him on the brief) Denver, CO, for Defendant-Appellee.

---

Before **EBEL**, **ALDISERT**[*] and **HOLLOWAY**, Circuit Judges.

---

**ALDISERT**, Circuit Judge.

---

[*] Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

We have previously set forth controlling legal precepts governing conduct of drug interdiction police officers who approach bus passengers at random to ask questions and request consent to searches. See United States v. Broomfield, 201 F.3d 1270 (10th Cir. 2000), cert. denied, 531 U.S. 830 (2000), United States v. Hill, 199 F.3d 1143 (10th Cir. 1999). This appeal by the government from district court orders suppressing evidence and statements requires us to apply those cases as well as the teachings of the Supreme Court recently set forth in United States v. Drayton, 122 S. Ct. 2105 (2002).

In Drayton, the Court reaffirms its basic premise set forth in Florida v. Bostick, 501 U.S. 429 (1991) that when police officers ask questions of bus passengers to obtain their consent to searches, "[t]he proper inquiry necessitates a consideration of 'all the circumstances surrounding the encounter'" in order to determine if a Fourth Amendment seizure occurred. Drayton, 122 S. Ct. at 2111 (quoting Bostick, 501 U.S. at 439). Emphasizing the fact-specific and broad nature of a "totality of circumstances" test, the Court in Drayton, nevertheless, offers explicit guidance. It suggests that drug interdiction interviews on a bus will pass constitutional muster if "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Id. at 2112.

We use these teachings, as well as our previous explications in Broomfield and Hill, to analyze the specific issues presented to us for decision: whether the district court

erred (a) in determining there was an illegal seizure by the government of a bus passenger's baggage and (b) in deciding that a subsequent detention of the passenger based on this improper seizure vitiated the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966).

We reverse the judgment of the district court, but note that it did not have the teachings of Drayton when this case was before it.

## I.

An indictment charged Homero C. Tapia with possession of 500 grams or more of methamphetamine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii).  Following a hearing, the district court granted Tapia's motion to suppress 14 pounds of methamphetamine found in his baggage aboard a Greyhound bus and suppressed his subsequent statements to law enforcement.  These suppression orders form the subject of the government's appeal.

The district court's jurisdiction was based on 18 U.S.C. § 3231.  The notice of appeal was timely filed and we have jurisdiction pursuant to 18 U.S.C. § 3731.  In reviewing an order suppressing evidence we apply a de novo standard.  United States v. Little, 60 F.3d 708, 712 (1995).

## II.

While a Greyhound bus was being serviced in the garage area of the terminal at Grand Junction, Colorado, police officers with the Grand Valley Joint Drug Task Force

sought to inspect the bus as part of a routine narcotics interdiction effort. With Greyhound's permission, the officers utilized a drug detection dog to begin sniffing the luggage in the lower baggage compartment. The dog alerted on a cardboard U-Haul box that had a numbered claim tag but the space on the tag for the owner's name was blank. The tag indicated that the box had been placed on the bus in Bakersfield, California, with a final destination of Denver, Colorado.

After being serviced, the bus was driven back to the loading lane and passengers were permitted to board. As the driver left the bus to update his dispatcher by telephone he gave three police officers permission to board the bus. All the officers wore plain clothes, had their weapons concealed and displayed official police badges around their necks.

As Detective Curt Moreno of the Grand Junction Police Department boarded the bus, he made the following announcement in English:

> Hello, ladies and gentlemen. We're detectives of local law enforcement. Today we would like to come and board the bus and speak with each and every one of you, if it is okay with you. It is not our intent to in any way delay your trip. I want you to feel free to move about...the bus as usual.

App. at 121. Moreno and a second officer then went to the back of the bus. The third officer, Investigator Miller, remained at the front, standing near the driver's seat. The aisle remained clear and the door of the bus was open during the entire episode. Some passengers chose to move about the bus but none left.

Moreno personally interviewed all the bus passengers while the second officer remained behind him. For each interview, Moreno would stand to the rear of the seated passenger so as to leave the aisle unobstructed. He would first ask the passenger, "How are you doing?" and then ask questions about the passenger's destination, originating city, the number of bags he had with him or her, whether his luggage contained any weapons, drugs or explosives and whether he would consent to a search of his luggage for any of those items.

Tapia was sitting in a window seat near the middle of the bus. When Moreno approached him and asked, "How are you doing?" Tapia answered in Spanish. Moreno then switched to Spanish and the conversation continued. When asked where he was going, Tapia stated, "Denver." When asked where he had come from, he answered, "Bakersfield, California." While Moreno was asking these questions, Tapia, without being requested to do so, began to hand over his bus ticket envelope. Before doing so, Tapia removed from it what appeared to be a baggage claim ticket. He kept this object in his right hand. Moreno noted that the ticket was for a trip from Bakersfield to Denver and that the ticket contained no name.

After Moreno pointed to the Tapia's right hand and asked, "What's that?" Tapia gave him the baggage claim ticket and made no verbal response to the question. Moreno noticed that the ticket had the same claim number as the previously observed U-Haul box. The claim ticket, like Tapia's bus ticket, bore no name. Moreno handed the ticket back to

Tapia and asked him how many bags he had on the bus. Tapia responded in English, "One" and then said that it was a "box" that was *debajo* or underneath (presumably in the baggage compartment). Moreno then asked and received permission from Tapia to search the box for weapons and drugs. The entire conversation took less than a minute.

Moreno continued questioning other passengers and all of the interviews took approximately 10 to 14 minutes. At this time, Investigator Miller, who had been standing at the front of the bus, alighted to search Tapia's box in the baggage compartment. The box contained a blanket, a six-pack cooler, trousers and a child's backpack. Miller also detected an unknown substance leaking from the walls of the box and after investigation saw that the two sides of the box contained false walls about two inches thick. Inside these walls he found more than 14 pounds of methamphetamine packed in plastic bags.

Tapia was arrested on the bus and taken to the Grand Junction police department. In a conference room at the department, a Spanish-speaking Immigration and Naturalization Service agent advised Tapia of his Miranda rights in Spanish using a written Advisement of Rights form. After reviewing and signing the form, Tapia was interviewed by police officers who were dressed in plain clothes and displayed no weapon. Tapia was neither handcuffed nor restrained during the interview and subsequently agreed to participate in a controlled delivery of the methamphetamine. After being flown to Denver, Colorado, the attempted delivery was unsuccessful.

The following day Tapia was interviewed again at the United States Marshals' facility in Denver and he was again advised in Spanish of his <u>Miranda</u> rights using a Drug Enforcement Agency advisement form. Tapia verbally acknowledged these rights and chose to waive them. He agreed to speak with the interviewing agents who were dressed casually and not armed. The interview took approximately 30 minutes.

## III.

Following indictment, Tapia moved to suppress all evidence seized during the search of the U-Haul box, arguing that his consent to the search of his luggage was tainted by an illegal detention. Tapia also moved to suppress all statements he made to the police, arguing that the statements were made without proper compliance with <u>Miranda</u> procedures. He asserted that his statements were an involuntary product of the subsequent illegal detention.

The district court concluded that Tapia's interaction with Moreno on the bus was not consensual. It found that Tapia "was not informed that he was not required to converse with the police or that he could refuse the agent's requests." <u>United States v. Tapia</u>, No. 00-CR-149-B at 8 (D. C. Dec. 19, 2001) (memorandum opinion and order) (hereinafter "D. Op."), <u>reprinted in</u> App. at 91. The district court acknowledged what we set forth in <u>Broomfield</u>, 201 F.3d at 1275 — that there is no merit to an argument that "an officer's conduct or position on [a] bus convey[s] the message that compliance with his requests [is] required" when no weapon is displayed, no coercive or threatening gestures

- 7 -

or comments are made and the officer speaks in an even tone — but concluded that the facts of this case were closer to those in <u>United States v. Guapi</u>, 144 F.3d 1393 (11th Cir. 1998) — in which an unconstitutional seizure occurred — because there were three officers present in this case, and, as in <u>Guapi</u>, one officer was positioned in the front of the bus.

The district court went further. It determined Tapia's consent in the search of his luggage was tainted by his illegal detention. Applying factors set forth in <u>Brown v. Illinois</u>, 422 U.S. 590, 602-605 (1975) the court decided that the government failed to prove a "sufficient attenuation or 'break in the causal connection between the illegal detention and the consent,'" D. Op. at 13, <u>reprinted in</u> App. at 96, (quoting <u>United States v. McSwain</u>, 29 F.3d 558, 562 n.2 (10th Cir. 1994)), and that the consent was "ineffective as the fruit of the poisonous tree." <u>Id.</u> at 14, <u>reprinted in</u> App. at 97 (quotation omitted). Alternatively, the court concluded that Tapia's consent to search was not the product of a "knowing, voluntary and intelligent waiver." <u>Id.</u>

The district court then ruled that Tapia's statements to police during his two post-arrest interviews should also be suppressed. Although acknowledging that Tapia had been adequately informed of his <u>Miranda</u> rights, it ruled that both statements were tainted by the original illegal detention after the seizure of the U-Haul box.

# IV.

We are persuaded that the district court committed a number of reversible errors

in its analysis of the police activity aboard the bus. The court followed the decision of the

United States Court of Appeals for the Eleventh Circuit, in United States v. Guapi:

> The circumstances in this case are much closer to those present in Guapi than in
> Broomfield. Three law enforcement officers wearing visible police badges
> boarded the bus after the passengers reboarded [sic]. Two officers positioned
> themselves at the back of the bus and the third stood near the open front door.
> Officer Moreno's announcement, given only in English, stated that the passengers
> could "move about the bus." Reasonably, this statement supports the negative
> inference that the passengers could not leave the bus.
>
> * * *
>
> Although none of these agents wore uniforms, they wore their police badges
> around their necks. Moreover, there were three officers on the bus in contrast to
> the lone officer in Broomfield.

D. Op. at 10, reprinted in App. at 93 (citations omitted).

In doing so, the district court looked disapprovingly on a precise set of facts that

the Court later favored in Drayton:

> As the passengers re-boarded, the driver checked their tickets and then left to
> complete paperwork inside the terminal. As he left, the driver allowed three
> members of the Tallahassee Police Department to board the bus as part of a routine
> drug and weapons interdiction effort. The officers were dressed in plain clothes
> and carried concealed weapons and visible badges.

Drayton 122 S. Ct. at 2109.

The district court also understated this court's precedents of Bloomfield and Hill,

in favor of Guapi, a decision of the Court of Appeals for the Eleventh Circuit. "A judicial

precedent attaches a specific legal consequence to a detailed set of facts in an adjudged

- 9 -

case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising <u>in the same court</u> or lower court in the judicial hierarchy."  <u>Allegheny Gen. Hosp. v. NLRB</u>, 608 F.2d 965, 969-970 (3d Cir. 1979) (footnote omitted) (emphasis added).

Decisions of other United States Courts of Appeals do not possess the command of precedents in this court.  They depend for their influence upon their own merits, not upon any legal claim they have to recognition, as distinguished from precedents of this court which are considered a legal source of law.

Moreover, the district court chose to rely on a case whose holding has now been specifically rejected by the Court in <u>Drayton</u>:

> Under these cases [<u>United States v. Guapi</u>, 144 F.3d 1393 (11th Cir. 1998) and <u>United States v. Washington</u>, 151 F.3d 1354 (1998)], it appears that the Court of Appeals would suppress any evidence obtained during suspicionless drug interdiction efforts aboard buses in the absence of a warning that passengers may refuse to cooperate.  The Court of Appeals erred in adopting this approach.

122 S. Ct. at 2112.  In the case at bar, the district court "erred in adopting this approach."  <u>Id.</u>

## V.

We are satisfied with the government's argument that the facts here are substantially similar to the <u>Drayton</u> facts so as to require a like result.  The government's argument is bottomed by what logicians call inductive reasoning by analogy, or reasoning from one particular case to another.  To draw a proper analogy between two entities is to

indicate one or more respects in which they are similar and thus argue that the legal

consequence attached to one set of particular facts may apply to a different set of

particular facts because of the similarity of the two sets.  We are satisfied that the

government has met its burden.  We believe that the facts in the case at bar closely

resemble those in <u>Drayton.</u> [1]

_____

[1]The facts of <u>Drayton</u> read as follows:

As the passengers reboarded, the driver checked their tickets and then left to complete paperwork inside the terminal.  As he left, the driver allowed three members of the Tallahassee Police Department to board the bus as part of a routine drug and weapons interdiction effort.   The officers were dressed in plain clothes and carried concealed weapons and visible badges.

Once onboard Officer Hoover knelt on the driver's seat and faced the rear of the bus.  He could observe the passengers and ensure the safety of the two other officers without blocking the aisle or otherwise obstructing the bus exit.  Officers Lang and Blackburn went to the rear of the bus.  Blackburn remained stationed there, facing forward.  Lang worked his way toward the front of the bus, speaking with individual passengers as he went.  He asked the passengers about their travel plans and sought to match passengers with luggage in the overhead racks.  To avoid blocking the aisle, Lang stood next to or just behind each passenger with whom he spoke.

* * *

Respondents were seated next to each other on the bus.  Drayton was in the aisle seat, Brown in the seat next to the window.  Lang approached respondents from the rear and leaned over Drayton's shoulder.  He held up his badge long enough for respondents to identify him as a police officer.  With his face 12-to-18 inches away from Drayton's, Lang spoke in a voice just loud enough for respondents to hear:  "I'm Investigator Lang with the Tallahassee Police Department.  We're conducting bus interdiction [sic], attempting to deter drugs and illegal weapons being transported on the bus.  Do you have any bags on the bus?" App. at 55.  Both respondents pointed to a single green bag in the overhead luggage rack.  Lang asked, "Do you mind if I check it?," and Brown responded, "Go ahead." <u>Id.</u> at 56.  Lang handed the bag to Officer Blackburn to check.  The bag contained no contraband.

Officer Lang noticed that both respondents were wearing heavy jackets and baggy pants despite the warm weather.  In Lang's experience drug traffickers often use baggy

- 11 -

In Drayton, the Court summarized what it deemed appropriate conduct by

members of a police drug interdiction team in questioning bus passengers:

> There was no application of force, no intimidating movement, no overwhelming
> show of force, no brandishing of weapons, no blocking of exits, no threat, no
> command, not even an authoritative tone of voice. It is beyond question that had
> this encounter occurred on the street, it would be constitutional. The fact that an
> encounter takes place on a bus does not on its own transform standard police
> questioning of citizens into an illegal seizure. . .Indeed, because many fellow
> passengers are present to witness officers' conduct, a reasonable person may feel
> even more secure in his or her decision not to cooperate with police on a bus than
> in other circumstances.

122 S. Ct. at 2112 (citation omitted).

Having concluded that the facts in the case at bar qualify as a proper analogue to

those in Drayton, we conclude that the same legal consequence should apply — that there

was a proper consent obtained for seizure of the contraband. Accordingly, the district

clothing to conceal weapons or narcotics. The officer thus asked Brown if he had any
weapons or drugs in his possession. And he asked Brown: "Do you mind if I check your
person?" Brown answered, "Sure," and cooperated by leaning up in his seat, pulling a
cell phone out of his pocket, and opening up his jacket. Id. at 61. Lang reached across
Drayton and patted down Brown's jacket and pockets, including his waist area, sides, and
upper thighs. In both thigh areas, Lang detected hard objects similar to drug packages
detected on other occasions. Lang arrested and handcuffed Brown. Officer Hoover
escorted Brown from the bus.

Lang then asked Drayton, "Mind if I check you?" Id. at 65. Drayton responded by
lifting his hands about eight inches from his legs. Lang conducted a pat-down of
Drayton's thighs and detected hard objects similar to those found on Brown. He arrested
Drayton and escorted him from the bus. A further search revealed that respondents had
duct-taped plastic bundles of powder cocaine between several pairs of their boxer shorts.
Brown possessed three bundles containing 483 grams of cocaine. Drayton possessed two
bundles containing 295 grams of cocaine.

122 S.Ct. at 2109-2110.

court here erred in suppressing the evidence contained in the U-Haul box in the baggage compartment of the bus.

## VI.

Having held that the initial detention was not unconstitutional and the ensuing consent was valid, we turn to the district court's vitiating of the warnings required by Miranda v. Arizona and duly administered by law enforcement authorities. Although the district court determined that Tapia's two Miranda waivers were voluntary, it held that "the taint of Mr. Tapia's illegal detention remained at the time he waived his Miranda rights in Grand Junction." D. Op. at 24, reprinted in App. at 107. Thus, his waiver, a "'fruit' of the illegal detention, was invalid." Id. The court further determined that "[t]he statements made by Mr. Tapia to the police in Denver, Colorado were obtained by 'exploitation of the illegality of his arrest,'... [so] his second Miranda waiver remained tainted by his illegal detention and, therefore, was invalid." Id. at 25, reprinted in App. at 108, citing Brown, 422 U.S. at 600.

Thus, the district court's theory was based on polysyllogisms with the first syllogism, or prosyllogism, concluding that an illegal detention and seizure had taken place. This then forms the major premise of the second, or episyllogism, concluding that the taint of the original illegal detention vitiated the effect of properly administered Miranda rights on two different occasions.

Having decided that there was no illegal detention, we must perforce determine that the district court's major premise in the second, or <u>Miranda</u> warning syllogism, is invalid because it is not true. Accordingly, the district court's conclusion must fail. We hold that because there was no illegal detention prior to or at the time Tapia was given these warnings, the district court committed reversible error in suppressing statements he made to the authorities.

* * * * *

We have considered all contentions of the parties and conclude that no further discussion is necessary.

The order of the district court suppressing the evidence and statements is REVERSED.