**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Selathious R. BOBO and Cedrick
Merritt Defendants–
Appellants.**

**Nos. 99–6013, 99–6014.**

United States Court of Appeals,
Sixth Circuit.

Jan. 10, 2001.

Before DAUGHTREY and MOORE, Circuit Judges; CLELAND,* District Judge.

---

* Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

CLELAND, District Judge.

## I. INTRODUCTION

This matter is before the Court on the appeals of defendants Selathious R. Bobo and Cedric Merritt. Both were indicted by a federal grand jury on October 29, 1998, and charged with conspiring to possess methamphetamine with the intent to distribute and to distribute it, in violation of 21 U.S.C. § 846 (Count I), and possessing methamphetamine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II). Bobo and Merritt each filed evidence suppression motions that were denied by the district court. Subsequently, both defendants pleaded guilty to Counts I and II of the indictment, reserving their right to appeal the evidence question, and were sentenced. Both now appeal the district court's ruling on their suppression motions and the sentences imposed.

## II. DISCUSSION

### A. Whether the District Court Erred in Denying Defendants' Motions to Suppress.

Defendants allege that the district court erred in denying their motions to suppress. They claim that they were unconstitutionally seized twice on the night of their arrest.

#### 1. Background

Two remarkably similar events form the basis for our understanding of this case. One occurred in June 1998, during which both defendants were detained but neither was arrested. The other occurred four months later on October 16, the date that

gives rise to the arrests and convictions before the Court.

On June 30, 1998, Bobo and Merritt were stopped by police officers in the bus station in Memphis, Tennessee. The officers found $33,455 in the bag Bobo was carrying, and $39,010 in the bag Merritt was carrying. The cash was in large bundles, wrapped in gray duct tape. The two bags containing the taped bundles were placed in an array of luggage and then examined by a drug dog, who "alerted" to their bags, thus indicating the presence of narcotics. No narcotics were found, and neither defendant was charged with a crime from these events, but the large amount of cash discovered was clearly enough related to narcotics trafficking that it was seized.

Then, on October 16, 1998, around 9:00 p.m., Memphis Police Detectives William Green and Keith Watson[1] were working with search dogs at the bus station in Memphis and checking the arriving bus from Dallas, Texas. Officer Green boarded the bus, and, addressing the passengers collectively, advised them that he was a narcotics officer and stated, "once you exit the bus just on a volunteer basis if you hold your bag low enough or place your bag on the ground so that our dog can smell your bag."

Defendant Bobo was the first to exit the bus. Officer Watson asked if the dog could examine Bobo's bag, and Bobo said, "Yes." Bobo placed his bag on the ground for the dog but then took about five steps back away from the bag. Thinking Bobo was going to run, officer Green stepped in front of him and asked "you ain't fixing to

run, are you," to which Bobo responded, "No." When Merritt placed his bag on the ground, he engaged in an almost identical maneuver away from the bag, and officer Green again felt compelled to block him from running. Both officers found Bobo's and Merritt's behavior unusual in their experience with bus passengers, and officer Green testified that he previously had encountered similar behavior in persons with drugs on their bodies, seeking to avoid detection by drug dogs.

The officers' dog examined both Bobo's and Merritt's luggage but did not alert. Defendants then retrieved their luggage and entered the terminal. The officers could see inside the building and watched as the two men walked toward the front doors. The two were in an obvious hurry, walking so rapidly and carelessly that they knocked over a large artificial plant arrangement and bumped "hard" into several people without pausing. Officer Watson testified that "[i]t was like football players, they kept going."

Seeing all this, the officers immediately suspected the two men might have drugs on their bodies and decided to approach them again. Still outside, the officers quickly moved toward the front of the station as the defendants continued toward the front doors. Once in front of the building, the officers noted that the defendants were already outside walking westbound. Officer Green testified that his partner yelled something similar to, "[c]ome here, I want to talk to you." The two men, about 90 feet away by this time,[2] did not respond but kept walking and climbed into a cab. Officer Watson contin-

---

1. These officers were unaware of the events of June 30 involving Bobo and Merritt.

2. At argument it was suggested by defense counsel that being 90 feet away on a city street makes it understandable that a person

being hailed might not hear and respond. We know of no evidence in the record, however, that indicates whether or not Union Street in Memphis was crowded or noisy at 9:00 on this particular October night.

ued to watch the two men, while officer Green went to get his truck.

Officer Green followed the cab until Watson could catch up to the vehicles. The cab shortly after pulled over to the side of the road.[3] As the cab stopped, Bobo and Merritt jumped out and ran in different directions. Officer Green pursued Merritt while officer Watson pursued Bobo. As Merritt ran, officer Green saw him withdraw objects from his clothing and throw them aside. When officer Green finally caught Merritt, he discovered duct tape wrapped around the sleeves of Merritt's t-shirt but was unable to find the discarded objects.

Officer Watson, meanwhile, was chasing Bobo. He watched Bobo reach to the sides of his body and saw two bundles fall out, one from under each arm. Officer Watson eventually apprehended Bobo and recovered the bundles, which contained methamphetamine. Officer Watson also noticed duct tape wrapped around the sleeves of Bobo's shirt as a makeshift harness.

At the suppression hearing, defendants sought to exclude the methamphetamine that had been found in their possession. The district judge, however, relying upon the recommendation of a magistrate judge, orally denied the motion.

## 2. Standard of Review

This Court reviews the district court's factual findings in a suppression hearing under the clearly erroneous standard and the district court's conclusions of law *de novo.* Further, the district court's

determination as to whether certain facts establish a seizure in violation of the Fourth Amendment should be reviewed *de novo.* *United States v. Avery,* 137 F.3d 343, 348 (6th Cir.1997).

## 3. Analysis

We conclude that the district court's denial of defendants' motions to suppress was without error.

In *Florida v. Bostick,* the United States Supreme Court addressed the constitutionality of drug interdiction efforts such as those at issue in this case. The Court reversed a decision in which the Florida Supreme Court had adopted "a per se rule prohibiting the police from randomly boarding buses as a means of drug interdiction." 501 U.S. 429, 435, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Instead, the Court held that the appropriate inquiry is whether under "all the circumstances surrounding the encounter ... the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439. The Court held that the fact the encounter took place in the cramped confines of a bus is but one factor to be taken into consideration. Two additional factors that the Court found "particularly worth noting" were, first, whether the police specifically advised the passengers that they had the right to refuse consent, and second, whether they made any show of force. *Id.* at 432.

---

**3.** There was some dispute about why the cab pulled over. Officer Green testified that the cab stopped of its own accord, owing to some confusion on the part of the driver about where the passengers wanted to go. The officer said that the cab driver stated that the passengers gave him no direction other than indicating that they wanted to leave the terminal. A report written by officer Watson indi-

cated that the officers stopped the taxi with their overhead lights flashing. Both officers acknowledged that the cab was unable to leave the curb by the time that both police vehicles had arrived and boxed it in. The magistrate concluded, as will we, for the sake of argument, that the officers had required the cab to stop.

■ In this case, the district court's denial of the defendants' motions to suppress was proper, because under all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person "that the person was . . . free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439. Officer Green told the passengers that the inspection was on a "voluntary basis"; neither officer had his weapon drawn or made any type of threatening movement toward any of the passengers; and no evidence was presented to suggest that the officers used a coercive or confrontational tone.

The defendants argue that, by stationing themselves immediately at the exit of a bus with a large dog,[4] the officers negated any effect of their statement that the inspection was voluntary. Further, they point out that they were not randomly selected for a search, but that everyone on the bus was asked to be searched. For the reasons fully stated in the magistrate judge's recommendation, however, we find that the case law does not support defendants' argument.

■ Similarly, we will affirm the district court's conclusion that defendants were not seized until the officers actually apprehended them after the chase. In *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court held that

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure. . . . An arrest requires *either* physical force . . . or, where that is absent, *submission* to the assertion of authority.
>
> "Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest. There can be no arrest without either touching or submission."

*Id.* at 626–27 (citation omitted); *see also United States v. Williams*, 949 F.2d 220, 221–22 (6th Cir.1991) (holding that officer's yelling "halt" and beginning chase did not constitute a "seizure" until defendant was stopped and arrested, by which time officers had observed defendant attempting to discard what appeared to be crack cocaine, giving them probable cause for arrest).

Requiring defendants' taxi cab to pull over to the curb, with lights and sirens operating, was analogous to a policeman yelling, "Stop, in the name of the law!" at a fleeing suspect. Thus, no arrest could have occurred until the defendants either submitted to the officers' authority or until the officers physically seized defendants. Because the defendants fled, they were not "seized" until physically apprehended.

■ Furthermore, even if stopping the taxi cab were a "seizure," under the circumstances, it was a valid *Terry* stop.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer may stop an individual, question him, and perform a carefully limited pat down search for weapons where the officer reasonably concludes that criminal activity may be afoot. Because of the intrusive nature of such a search, the

---

4. A 60 to 70 pound Labrador Retriever.

police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." The officer must be able to articulate something more than an "inchoate and unparticularized suspicion or hunch."

*United States v. Harris,* 192 F.3d 580, 583–84 (6th Cir.1999) (internal citations omitted).

The magistrate judge, whose recommendation was adopted by the trial judge, found that the officers were aware of the following facts at the time of the stop: "(1) Merritt and Bobo had stepped quickly away from the drug dog at the bus station in a manner that, according to the officers who had considerable experience dealing with bus passengers' reactions to their animals and investigative activities, was unusual for persons not carrying drugs on their persons; (2) the men had hurried through the bus station, knocking over a plant and bumping into people, prompting the officers to verbally note that they might be carrying drugs and to further observe and finally follow them; and (3) outside the bus station, defendants ignored the officers when called out to and continued walking away." These facts, taken in series as a whole, were sufficient to justify at least the initial stop.

Defendants argue that a person might step back from a dog out of fear, but the officers testified that defendants' conduct was similar to conduct of drug couriers they had apprehended in the past. *See United States v. Smith,* 201 F.3d 1317, 1323 (11th Cir.2000) (stating that court should "bear in mind that behavior, seemingly innocuous to the ordinary citizen, may 'appear suspect to one familiar with the practices of narcotics couriers' "). Similarly, defendants argue that it is not unusual for people to hurry through a bus terminal. These defendants, however, were not simply hurrying, but were rushing so single-mindedly that they knocked over a plant and nearly knocked over several people, without appearing to notice. They gave no observable reaction and did not appear to apologize or assist, as ordinarily would be expected, even from persons in a hurry. Defendants, donning blinders, argue that some people are in a hurry, some people are rude, and some of those people in a hurry are also people who are rude; thus, one cannot draw a conclusion of any kind from such observations. We disagree. *In toto,* the officers were sufficiently aware of specific and articulable facts that justified the stopping of the taxi cab.

Because no unlawful seizure occurred either at the bus station or after defendants left in the taxi cab, the Court will affirm the district court's denial of defendants' motions to suppress.

### B. Whether the District Court Erred in its Application of the Sentencing Guidelines.

#### 1. Background

At the sentencing hearing, the parties stipulated to the following additional facts that were not presented during the suppression hearing:

1. On June 30, 1998, four months prior to their arrest, defendants Bobo and Merritt were stopped by police officers in the bus station in Memphis, Tennessee. The officers found $33.455 in the bag Bobo was carrying, and $39,010 in the bag Merritt was carrying. The cash was found in large bundles, wrapped in gray duct tape (as were the bundles of drugs found in October). The two bags containing the taped bundles were placed in an array of luggage and then examined by a drug detecting dog. The

dog alerted to both Bobo's and Merritt's bags and not to any of the others.

2. Bobo told the officers that he did not own the money, that he was carrying it for Merritt, and that they were taking the money to Dallas, where they would stay for a couple of days and then return to Memphis. Merritt claimed ownership of the money in both bundles and stated that he earned it by working as a carpet cleaner. Merritt stated that he had only $34,000 in both bags. Merritt later changed his story and stated that the money did not belong to him and that he was transporting the money to Dallas for a third party whom he would not identify.

3. Bobo and Merritt were fingerprinted and then released. As he was leaving, Merritt turned to an officer and commented that "you have not done anything" and "there is more where this came from. You are not going to stop drugs in this country."

At the sentencing hearing, the district court found that the $72,475 in cash seized in June should be converted to an equivalent amount of methamphetamine for the purposes of sentencing. The practical effect of this decision was to increase significantly the defendants' sentences. Defendants now challenge the trial judge's inclusion of the drug quantity derived by computing the amount of methamphetamine that could be purchased with the seized cash.

### 2. Standard of Review

A determination of the appropriate drug quantity for sentencing requires "a finding of fact that must be supported by the preponderance of the evidence." *United States v. Jackson*, 990 F.2d 251, 252 (6th Cir.1993); *see also United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir.1990) (holding that district court must ensure that "the defendant is more likely than not actually responsible for a quantity greater than or equal to the quantity for which [he] is being held responsible," erring on the side of caution). This Court reviews the district court's factual findings "on a 'clear error' standard, which does not change the prosecution's burden of proving certain necessary facts at sentencing by a preponderance of the evidence." *Jackson*, 990 F.2d at 253.

### 3. Analysis

■ Both parties acknowledge that the method of calculation applied by the district court in this case is approved under the United States Sentencing Guidelines[5] and the case law of the Court of Appeals for the Sixth Circuit.[6] Further, defendants have not contested the accuracy of the calculation itself. Accordingly, this Court must determine only whether the district court clearly erred in finding that the money found with the defendants on June 30, 1998, more likely than not, was connected to their October 16, 1998 arrest for drug trafficking. We find that this standard has been satisfied.

---

5. Application note 12 to U.S.S.G. § 2D1.1 provides, in relevant part, as follows:

Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar

transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

6. *See, e.g., United States v. Berry*, 90 F.3d 148 (6th Cir.1996) (noting that very purpose of U.S.S.G. § 2D1.1 is to hold the defendant responsible for drugs even when there is no drug seizure).

First, on both occasions defendants Bobo and Merritt were traveling together. In June they were stopped while boarding a bus to Dallas, and in October they were stopped while embarking from the Dallas bus. During the June stop, a drug detecting dog alerted to the luggage with the cash in it, indicating the presence of drug residue. The cash defendants carried in June was wrapped in duct tape, as were the drugs carried in October. In June, after defendants were released, Merritt all but acknowledged that the money was for drugs: "you have not done anything ... there is more where this came from. You are not going to stop drugs in this country." Finally, neither defendant offered a plausible alternative explanation for the presence of such a large amount of cash.

Based on the cumulative effect of these undisputed facts, we conclude that the trial court did not err in calculating the amount of drugs involved in the offense based on the amount of money defendants were carrying in June.

### C. Whether Defendant Bobo Properly Was Denied a "Minor Participant" Reduction

#### 1. Background

Defendant Bobo asserts that the trial court erred in finding that, because he had been entrusted with a great deal of money, he was not a minimal or minor participant in the offense pursuant to U.S.S.G. § 3B1.2.

#### 2. Standard of Review

■ Defendant Bobo bore the burden "of proving mitigating factors justifying a reduction for being a minor participant by a preponderance of the evidence." *United States v. Miller*, 56 F.3d 719, 720 (6th Cir.1995). This Court reviews a district court's factual determination regarding a defendant's role in the offense for clear error. *United States v. Jackson*, 55 F.3d 1219, 1224 (6th Cir.1995).

#### 3. Analysis

Section 3B1.2 of the United States Sentencing Guidelines provides as follows:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

(c) In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2.

■ Defendant Bobo is not entitled to a minor participant adjustment as provided under this section merely because there may have been higher levels in the conspiratorial hierarchy or merely because others may have "planned a scheme and made all the arrangements for its accomplishment." *United States v. Miller*, 56 F.3d 719, 720 (6th Cir.1995). Nor can labeling his role as that of a courier justify a reduction. *See Ajala v. United States Parole Commission*, 997 F.2d 651, 656 (9th Cir. 1993) (stating that "the mere fact that a defendant acted as a drug courier does not mean his role was minimal or minor"); *United States v. Carr*, 25 F.3d 1194, 1207–08 (3d Cir.1994) (holding that courier in money laundering scheme who was traveling with the kingpin was not a minor participant).

■ Here, Bobo's argument relies upon an artificially narrow view of a series of events and facts. The court did not decide this issue "just because" Bobo was entrusted with a large quantity of money. His involvement was not limited to the trans-

portation of drugs in October nor limited to the transportation of the drug money in June. That he was entrusted with such a large amount of money is but one indication that he played more than a minor or minimal role in the conspiracy. More importantly, however, Bobo has the burden of proving mitigating factors to justify a reduction. *Miller*, 56 F.3d at 720. Bobo failed to present such evidence both at the hearing and in his appellate brief. Accordingly, the district court did not err in refusing to grant him status as a minor or minimal participant.

### III. CONCLUSION

The judgment of the district court is AFFIRMED.