[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 11, 2007
THOMAS K. KAHN
CLERK

_____

No. 07-10182
Non-Argument Calendar

_____

D. C. Docket No. 06-00134-CR-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERIC LAVON SALTER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(September 11, 2007)**

Before BLACK, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

Eric Lavon Salter appeals his conviction for possession of a firearm by a

convicted felon, in violation of 18 U.S.C. § 922(g).  For the reasons that follow, we affirm.

## I.  BACKGROUND

In June 2006, Salter was indicted for one count of possession of a firearm by a convicted felon.  Salter filed a motion to suppress the firearm and dismiss the indictment on the grounds that the firearm was seized during an unlawful detention and search.  Testimony at the suppression hearing adduced the following:

On April 8, 2006, between 4:00 and 5:00 AM, Sergeant James Wright of the Evergreen, Alabama Police Department was patroling the Crestview Subdivision, which consists of several duplex apartment buildings.  Sergeant Wright was familiar with the area because, over the previous twelve years, he had made numerous arrests for drug- and alcohol-related offenses.  He had also been involved in various homicide, rape, and burglary investigations at the complex.  On the morning in question, Wright observed three people standing partially in the shadows at the back corner of one of the buildings, near a wooded area.  Sergeant Wright also noticed what appeared to be open containers of alcohol on the ground in front of the individuals.

After making these observations, Wright drove around the block to the office area of the apartment complex and called for backup.  When Evergreen

Police Department Officer Brandon Lisabelle and Conecuh County Sheriff's Deputy Stephen Ferguson arrived, all three officers walked to the scene and` found three persons—one unidentified male and two persons who were later identified as Salter and his sister, Sharnita Northern—standing together talking. As Sergeant Wright approached the subjects, he detected the odor of alcohol, but could not determine the source. Both Wright and Lisabell observed that there were open containers of alcohol on the ground and that Salter and his sister had open containers in their hands. The officers shined a light on the three individuals and told them, "Don't move." Wright, who knew many people in the neighborhood but did not recognize any of the subjects, stated, "I don't know you and you don't know me." Wright also observed that the subjects appeared nervous, especially the unidentified male who acted "very suspicious." Wright then asked the trio for their names, dates of birth, and social security numbers, and he radioed the information to the police dispatcher to determine whether any of the subjects had outstanding warrants.

Wright then asked the trio to face the wall so that he could perform a weapons pat-down, as he believed that there was a possible threat to the officers' safety. All three subjects complied with Sergeant Wright's request, but before the pat-down began, Salter fled. Wright and Ferguson gave chase and ordered Salter

3

to stop. Salter continued to run and reached toward his pocket. At this point, Deputy Ferguson deployed his Taser and Salter fell to the ground. Sergeant Wright handcuffed and searched Salter, finding a .22 caliber handgun and ammunition in his pants pockets. Afer subduing Salter, Wright returned to his patrol car where he learned that Salter had two outstanding felony warrants.

According to Northern, she had been residing with her grandmother at one of the apartments in the complex and was outside with Salter sharing a beer when the police approached them. They had been outside drinking beer for twenty minutes when the police arrived, and neither she nor Salter was intoxicated.

The district court denied Salter's motion to suppress and dismiss. Although the court found that Salter's conduct did not violate Alabama's prohibition on open containers of alcohol (because that law applied to open containers inside of vehicles), the court nonetheless concluded that the circumstances gave rise to a reasonable suspicion that Salter and his companions may have been violating Alabama's public intoxication statute. Thus, according to the court, the detention was lawful pursuant to Terry.[1]

The court also concluded that the pat-down was supported by reasonable suspicion, because Sergeant Wright reasonably believed that the trio posed a risk to

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

4

the officers' safety "given the hour (early in the morning), the location (arguably a high crime area), and the nervousness of one of the suspects." Finally, the court determined that even if the initial stop was improper, the seized firearm was admissible due to intervening circumstances and the doctrine of inevitable discovery, because the officers discovered that Salter had two outstanding felony warrants, which would have provided an independent basis for Salter's arrest and the discovery of the firearm during a search incident to the arrest.

Salter subsequently pleaded guilty pursuant to a written plea agreement, wherein he reserved his right to appeal the district court's denial of his motion to suppress and dismiss. The court sentenced Salter to 29 months' imprisonment and three years of supervised release. Salter now appeals.

## II. STANDARDS OF REVIEW

"We review a district court's denial of a motion to suppress evidence as a mixed question of law and fact, with rulings of law reviewed de novo and findings of fact reviewed for clear error, in the light most favorable to the prevailing party in district court." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007).

## III. DISCUSSION

### A. The Initial Encounter

The Fourth Amendment guarantees "[t]he right of the people to be secure in

their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure under the Fourth Amendment occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." United States v. Franklin, 323 F.3d 1298, 1301 (11th Cir. 2003) (quotation marks omitted). But "not every encounter between a police officer and a citizen" constitutes a seizure under the Fourth Amendment, as "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." Id. (citation omitted). To determine whether a person has been seized under the Fourth Amendment, "[t]he proper inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." United States v. Drayton, 536 U.S. 194, 202, 122 S.Ct. 2105, 2111, 153 L.Ed.2d 242 (2002) (quotation marks omitted). Facts relevant to this determination include whether the officers made any intimidating movements, displayed an overwhelming show of force, brandished weapons, made any threats, made any commands, or blocked the individual's path of exit. Id. at 204, 122 S.Ct. at 2112.

When a reasonable person would *not* feel free to terminate the encounter, he has been "seized," and the Fourth Amendment is implicated. Franklin, 323 F.3d at 1301. Under Terry, however, law enforcement officers may, consistent with the

6

Fourth Amendment, "stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity." United States v. Williams, 876 F.2d 1521, 1523 (11th Cir. 1989). To constitute a valid Terry stop, the officers conducting the stop must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). Although reasonable suspicion "requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 675-76, 145 L.Ed.2d 570 (2000). It "must be more than 'an inchoate and unparticularized suspicion or hunch.'" Powell, 222 F.3d at 917 (quoting Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)).

"A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," United States v. Gordon, 231 F.3d 750, 754 (11th Cir. 2000), even if the activity is "seemingly innocuous to the ordinary citizen." United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000). And although a person's "presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[,]" the police "are not required to ignore the relevant characteristics of a

7

location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Wardlow, 528 U.S. at 124, 120 S.Ct. at 676. Thus, an area's reputation for criminal activity is a factor that may be considered when determining whether reasonable suspicion exists. Gordon, 231 F.3d at 755-56. "[T]he police may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Lindsey, 482 F.3d at 1290-91 (quotation marks omitted). As such, "[r]easonable suspicion is determined from the totality of circumstances and collective knowledge of the officers." United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006).

The Government argues that no seizure occurred when the officers initially confronted Salter and his companions and asked them for their identification. To that end, the Government asserts that the seizure did not begin until Sergeant Wright asked Salter and the others to submit to a pat-down. Salter counters that the initial encounter was a non-consensual seizure at the outset, as "it was clear" that neither he nor his companions were free to leave. We need not decide this question, however, because, as discussed below, even if the seizure began when Sergeant Wright confronted the trio and told them not to move, there was an objectively reasonable suspicion that criminal activity was afoot, thereby justifying

8

a brief investigatory detention pursuant to Terry.

Before the officers approached Salter and his two companions, Sergeant Wright had observed (1) three individuals congregating at the back corner of an apartment building near the woods, (2) in the early morning hours (between 4:00 and 5:00 AM), (3) with what appeared to be open containers of alcohol, (4) in an area where numerous drug- and alcohol-related arrests had been made. And upon approaching the trio, there was a detectible odor of alcohol. At this point, viewing the facts in the light most favorable to the Government, objectively reasonable suspicion existed that Salter and the others were engaged in "criminal activity," including possibly violating the public intoxication statute.[2] As such, the officers were justified in detaining the trio to determine whether they were inebriated to the point of being a danger to themselves or others in violation of the statute. Thus,

---

[2] Alabama's Public Intoxication Act provides that:
> A person commits the crime of public intoxication if he appears in a public place under the influence of alcohol, narcotics or other drug to the degree that he endangers himself or another person or property, or by boisterous and offensive conduct annoys another person in his vicinity.

Ala. Code § 13A-11-10(a). Although Sergeant Wright may have been mistaken as to whether the mere presence of the open containers of alcohol, in and of itself, constituted a violation of the public intoxication statute, given the totality of the circumstances, the officers had an objectively reasonable suspicion that Salter and his companions were in violation of the public intoxication statute. See United States v. Chanthasouxat, 342 F.3d 1271, 1279 (11th Cir. 2003) ("[A] mistake of law cannot provide reasonable suspicion . . . to justify a traffic stop" pursuant to Terry. (emphasis added)); but see United States v. Nunez, 455 F.3d 1223, 1226 (11th Cir. 2006) ("[T]he question . . . is *not* whether a specific arresting officer . . . actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion *objectively existed* . . . ." (emphasis added)).

9

the district court did not err in holding that the detention was lawful.

## B. The Pat-down

In general, unless there is consent, police officers must obtain a warrant supported by probable cause to justify a search under the Fourth Amendment. United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). A warrantless search of a person is therefore presumptively unreasonable. United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983). But under Terry, an officer may frisk or pat-down an individual in order to conduct a limited search for weapons where the officer has reason to believe that the individual is armed and dangerous. Terry, 392 U.S. at 27, 88 S.Ct. at 1883. "Once an officer has legitimately stopped an individual, the officer can frisk the individual so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" United States v. Hunter, 291 F.3d 1302, 1307 (11th Cir. 2002) (quoting Terry, 392 U.S. at 27, 88 S.Ct. at 1883).

Salter argues that the pat-down of his person was unlawful because the officers had no reason to believe that their safety or the safety of others was in danger. We disagree.

As discussed above, upon approaching Salter and his companions, the officers had an objectively reasonable suspicion that the trio was engaged in

10

criminal activity, justifying their detention. Moreover, after the officers asked for the trio's names and social security numbers, Sergeant Wright noticed that all three individuals acted nervous and that the unidentified member of the trio acted "very suspicious." In addition, given that (1) the trio had gathered in the early morning hours, (2) in a high-crime area where Sergeant Wright had been involved in numerous investigations, including homicide investigations, over the previous twelve years, (3) there was a perceptible odor of alcohol, (4) a six-pack container of alcohol lay on the ground next to the trio, and (5) Salter and Northern held open beer bottles in their hands, "'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger,'" Hunter, 291 F.3d at 1307 (quoting Terry, 392 U.S. at 27, 88 S.Ct. at 1883), thereby justifying a Terry pat-down for weapons. And even if the totality of the circumstances did not warrant a belief that the trio posed a danger when Sergeant Wright initially asked them to submit to a pat-down, by the time the officers actually performed the pat-down, Salter's flight, in tandem with the aforementioned circumstances, provided sufficient reason to believe that Salter posed a danger to others. Accordingly, the district court did not err in holding that the weapons pat-down was lawful.

11

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM**.