UNITED STATES of America,
Plaintiff–Appellee,

v.

Ervin Herman FLOWERS,
Defendant–Appellant.

No. 89–5820.

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 1990.

Decided Aug. 28, 1990.

As Amended Sept. 20, 1990.

Co. v. Garland Pocahontas Coal Co., 97 W.Va. 368, 125 S.E. 226, 230 (1924).

Paul Kevin Carwile, James, McElroy & Diehl, P.A., Charlotte, N.C., for defendant-appellant.

Thomas J. Ashcraft, U.S. Atty., Charlotte, N.C., for plaintiff-appellee.

Before RUSSELL and WILKINSON, Circuit Judges, and BULLOCK, United States District Judge for the Middle District of North Carolina, sitting by designation.

WILKINSON, Circuit Judge:

The issue before us is whether appellant Flowers, a passenger on a Greyhound bus, was unlawfully seized when two narcotics officers entered the bus during a routine rest stop and initiated conversation with him. The district court, 724 F.Supp. 1206, held that Flowers was not seized within the meaning of the Fourth Amendment since a reasonable person would have believed that he was free to decline to answer question or to leave the bus. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). We affirm the judgment of the district court denying appellant's motion to suppress.

I.

On July 26, 1989, Officers Gerald Sennett and David Gehrke of the Vice and Narcotics Unit of the Charlotte Police Department were at the Charlotte Bus Station performing routine surveillance of buses arriving from places known to be source cities for narcotics. Their activities were part of an ongoing narcotics interdiction program in Charlotte involving the airport, the train station, and the bus station. The officers had obtained permission from Greyhound terminal management to check the buses.

On that day, Ervin Flowers was a passenger on Greyhound Bus 1091, which made a scheduled stop at 10:20 A.M. in Charlotte, North Carolina. The bus was en route from Detroit, Michigan, to Jacksonville, Florida. Detroit was known by Officer Sennett to be a source city for narcotics. The passengers exited the bus in Charlotte to use the rest rooms, buy refreshments, and tend to other matters. When the driver announced that the bus was ready to depart, the passengers boarded, giving their tickets to the driver.

At 10:50 A.M., after all departing passengers had entered the bus, Officers Sennett and Gehrke boarded with the permission of the bus driver. They were dressed in casual civilian clothes. Only the insignia on their jackets identified them as law enforcement officers. The officers were armed, but their weapons were concealed. They proceeded to the rear of the bus and

began to question the passengers. In each case, Officer Sennett would stand in the aisle behind the passenger, identify himself as a police officer by displaying his identification, and ask if the individual would mind speaking with him briefly. Sennett asked the passengers to identify their luggage and posed other questions as to their names and destinations. The questioning of each person normally took fifteen to twenty seconds. Officer Gehrke remained in the aisle behind Officer Sennett.

In turn, the officers approached Flowers, who was seated about one third of the way forward from the back of the bus. Following standard procedure, Sennett remained in the aisle to the rear of Flowers, identified himself, and asked Flowers if he could speak with him for a minute. Flowers answered, "Sure." In reply to Officer Sennett's questions, Flowers indicated that he was traveling from Detroit, Michigan, to Brunswick, Georgia, and that all of his luggage was stored beneath the bus. Flowers answered in the negative when asked if the bag directly above his seat in the overhead bin was his.

The officers continued questioning passengers until they reached the front of the bus. The only luggage not claimed was the piece in the overhead bin above Flowers' seat. Officer Sennett held the bag up and asked repeatedly if it belonged to anyone on the bus. When no one claimed the bag, Sennett concluded that it had been abandoned, took it outside, and opened it. He found in the bag a fully loaded .38 caliber pistol, a quantity of crack cocaine with an estimated street value of $25,000, and a wallet containing identification in the name of "Ervin Herman Flowers."

The officers then re-boarded the bus, again asked permission to speak with the passengers, and began asking each of them for identification. Flowers responded that he had no identification. He also volunteered that the allegedly abandoned bag belonged to an individual named "Ervin" who had disembarked at a prior stop. Officer Sennett testified that Flowers' hands were shaking and that he appeared to be perspiring. Flowers agreed to exit the bus and talk further with the officers. After further questioning, Flowers admitted that the bag and loaded gun were his, but he denied ownership of the drugs.

Flowers was placed under arrest. On August 8, 1989, a federal grand jury for the Western District of North Carolina indicted Flowers on one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a), and one count of carrying a firearm during the commission of a drug trafficking offense, in violation of 18 U.S.C. § 924(c). Flowers entered pleas of not guilty on both counts and moved to suppress all evidence obtained as a result of the officers' actions on July 26, 1989. He claimed that he was illegally seized when the officers entered the bus and questioned him, and that all evidence obtained thereafter should be suppressed as "fruit of the poisonous tree." On September 13, 1989, Flowers entered conditional guilty pleas to both counts of the indictment, preserving for appeal his Fourth Amendment claim, pursuant to Fed.R. Crim.P. 11(a)(2). After an evidentiary hearing, the United States magistrate recommended that Flowers' motion to suppress be granted. On review by the district court, the suppression motion was denied.

Flowers appeals.

### II.

Flowers contends that the police officers seized him unlawfully when they entered the bus and began to question him. We disagree. The officers did not seize Flowers merely by engaging him in conversation. Police may seek the voluntary cooperation of citizens in law enforcement activities without implicating the Fourth Amendment. Nothing about the officers' conduct here impaired Flowers' right to refuse to talk to them or to leave the bus.

### A.

"[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889

(1968). Law enforcement officers are more than mute observers. They do not violate the Constitution "by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions," or "by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *see Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–311, 83 L.Ed.2d 165 (1984); *United States v. Alpert*, 816 F.2d 958, 960 (4th Cir.1987); *United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986). If "the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16.

If every encounter between a citizen and a police officer constituted a seizure, it "would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Simple questioning by police is an important "tool for the effective enforcement of criminal laws." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." *Id.*

The ability of police to seek the assistance of citizens is nowhere more critical than in the struggle to stem the nationwide traffic in narcotics. As Justice Powell has noted:

> The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and wel-

fare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs ... may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

*Mendenhall*, 446 U.S. at 561–62, 100 S.Ct. at 1881 (Powell, J., concurring). Many cities have initiated drug interdiction programs in airports, train stations, and bus stations, similar to the one in Charlotte, North Carolina, that gave rise to the police conduct at issue here. *See, e.g., United States v. Hammock*, 860 F.2d 390, 391 (11th Cir.1988) (Ft. Lauderdale, Florida); *United States v. Lewis*, 728 F.Supp. 784, 785 (D.D.C.1990) (Washington, D.C.); *State v. Turner*, 94 N.C.App. 584, 380 S.E.2d 619, 619 (1989) (Raleigh, North Carolina). These programs seek to assure the safety of passengers and to prevent public transport from becoming a haven for narcotics trafficking. They depend for their success upon voluntary interviews with passengers, searches of abandoned or unclaimed luggage, and/or searches pursuant to voluntary consent. During the year prior to the events at issue, Officer Sennett of the Charlotte Police Department boarded approximately one hundred buses, resulting in fifteen seizures of bags containing illegal drugs and approximately seven arrests.

The exigencies of law enforcement do not, of course, override a citizen's constitutional rights. To the degree that the interviews or searches pursuant to these programs become involuntary, they would implicate the Fourth Amendment and require "some minimal level of objective justification." *INS v. Delgado*, 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984). However, not all activities of law enforcement authorities raise constitutional concerns. "Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person

would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Id.* at 216, 104 S.Ct. at 1763; *see Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877.

### B.

Flowers contends that his questioning by police, prior to the point of his incriminating statements and arrest, was sufficiently intimidating to constitute an unlawful seizure. He argues that the encounter here was inherently coercive because it took place in the limited confines of a bus, after the passengers had boarded for departure and surrendered their tickets. In addition, Flowers complains that the two police officers who questioned him were six feet tall and weighed approximately 195 pounds, that they wore jackets with police insignia, and that at least one of them carried a concealed weapon.

■ The district court, however, found nothing in the conduct of the officers in this case that impaired Flowers' right to terminate all contact. Flowers was under no obligation to answer any questions put to him. To the contrary, his interaction with police was voluntary and could have been terminated until the point that he admitted ownership of the bag containing illegal drugs and a loaded weapon. The trial court found that the police officers who questioned Flowers were non-threatening in their appearance and demeanor. They asked for permission before questioning him and they spoke to him in a casual tone of voice. The officers did not block the aisle or otherwise physically prevent Flowers from getting out of his seat or leaving the bus. When the officers entered the bus a second time to further question passengers after finding crack cocaine and a loaded gun in the unclaimed bag, they asked Flowers if he would come outside to speak with them. Flowers agreed and accompanied them off the bus. There is no evidence that the officers ever displayed weapons or restrained him in any way. The officers also cannot be charged with violating Flowers' Fourth Amendment rights by searching what he led them to believe was an abandoned bag. *See Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960).

The district court thus concluded that the officers did not impede Flowers' exit from the bus, did not touch or intimidate him, and did not coerce him to answer their questions through any display of authority. The court also found that the officers did not delay the bus beyond its customary layover of fifteen to thirty minutes in Charlotte, and that any deviation from its written schedule of departure was caused by the bus company. In sum, the court was "unable to find that a reasonable person in [Flowers'] situation would not feel free to leave a bus when the aisle is clear and the officers ask[ed] questions in a non-threatening manner."

We decline to hold that the fact that the occurrence took place on a bus automatically transforms it into a seizure, since Flowers was in no way restrained by the conduct of the officers. The test enunciated in *Mendenhall* was "designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). The setting of the contact is only one factor in determining whether a seizure has occurred. *See id.* at 573–74, 108 S.Ct. at 1979–80. It may well be, of course, that Flowers was reluctant to exit the bus and risk missing its departure. He may have experienced a "psychological constraint to remain with the vehicle—commonly felt by all travelers." *United States v. Rembert,* 694 F.Supp. 163, 174 (W.D.N.C.1988). Any such constraint, however, "was not in any way caused by the [officers'] presence or actions on the bus." *Id.* The situation here is similar to that in *Delgado,* 466 U.S. at 218, 104 S.Ct. at 1763, where employees who were questioned inside a factory were not "seized" since any restriction on their freedom of movement was caused "not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers."

Here there was no "display or announcement that the passengers could *not* get off the bus" and "a reasonable passenger who really needed to get off the bus would have approached the bus driver and asked for a minute to do what needed to be done." *Rembert,* 694 F.Supp. at 174 (emphasis in original). The district court credited Officer Sennett's testimony that passengers on other buses had freely exited the bus during prior narcotics investigations.

We thus conclude, as did the Eleventh Circuit on similar facts, that the officers here did nothing that would enhance the naturally restrictive characteristics of the interior of the bus. *See Hammock,* 860 F.2d at 393. *See also United States v. Carrasquillo,* 877 F.2d 73, 76 (D.C.Cir. 1989) (agents may approach individual on a train and ask permission to question without implicating the Fourth Amendment). To suppress the evidence in the face of such subdued official conduct would render all such interdiction programs suspect, since any passenger in public transport could claim compulsion stemming not from the conduct of an officer, but from his schedule of departure.

In this context, freedom to leave means fundamentally the freedom to break off contact, in which case officers must, in the absence of objective justification, leave a passenger alone. Flowers possessed at a minimum the right to refuse to speak with the officers, who in turn possess no right to detain citizens who decline to talk or otherwise identify themselves. *See Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Flowers' freedom to leave thus encompassed not only the freedom to depart from the bus, but the freedom to depart with the bus, which police officers in the absence of some articulable suspicion must allow. To hold otherwise would begin to transform this free society into one where travelers must present papers or proffer explanations to be on their way.

In *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877, the Supreme Court listed examples of circumstances that might cause an individual to believe that he was not free to leave, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." The Court concluded that, "[i]n the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of the person." *Id.* at 555, 100 S.Ct. at 1877. There was no such evidence here, and we decline to order the suppression of the incriminating evidence in this case.

### III.

Since Flowers was not seized within the meaning of the Fourth Amendment when police questioned him, the evidence obtained in the search of his bag and the incriminating statements made thereafter may not be suppressed as "fruit of the poisonous tree." Flowers does not dispute the district court's finding that the bag in which the loaded gun and drugs were found had been abandoned, and that the officers were therefore justified in opening it. *See Abel,* 362 U.S. at 241, 80 S.Ct. at 698. He concedes that police had probable cause to arrest him after he later confessed that the bag belonged to him. It is also clear from the record that the incriminating statements were not coerced.

The judgment of the district court is therefore

AFFIRMED.