**UNITED STATES of America**

v.

**Bienvenido OZUNA**

No. 00–0249CR.

United States District Court,
S.D. Florida,
Miami Division.

Jan. 23, 2001.

Brian K. Frazier, Assistant U.S. Attorney, Miami, FL, for Plaintiff.

William Thomas, Assistant Federal Public Defender, Miami, FL, for Defendant.

## ORDER DENYING MOTION TO SUPPRESS RULE 404(B) EVIDENCE

JORDAN, District Judge.

A grand jury indicted Bienvenido Ozuna on charges of importing cocaine and possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 952 and 841. Prior to trial, the government provided notice of its intent to introduce, pursuant to Federal Rule of Evidence 404(b), evidence obtained from Mr. Ozuna's 1995 arrest in Maryland for possession of cocaine. Mr. Ozuna now moves to suppress the evidence from the prior arrest, arguing that it was unconstitutionally obtained. Although, as explained below, the exclusionary rule applies to Rule 404(b) evidence, suppression is not warranted. First, the Maryland trooper who arrested Mr. Ozuna in 1995 acted lawfully under Eleventh Circuit precedent. Second, even if the trooper ran afoul of Eleventh Circuit precedent in detaining and arresting Mr. Ozuna, the Rule 404(b) evidence should not be excluded. The trooper acted properly pursuant to the law of the Fourth Circuit, whose jurisdictional boundaries include Maryland, and suppressing evidence obtained by a law enforcement officer in accordance with the law of his jurisdiction would not deter future police misconduct.

### I. THE CURRENT CHARGES

On March 18, 2000, Mr. Ozuna arrived at Miami International Airport onboard an American Airlines flight from Caracas, Venezuela. After being admitted into the United States by the Immigration and Naturalization Service, Mr. Ozuna proceeded with his luggage to the U.S. Customs Service for examination. During their secondary examination, customs inspectors asked Mr. Ozuna routine questions pertaining to his travel. While examining Mr. Ozuna's luggage, the inspectors discovered two wooden award plaques which emitted a glue-like odor. The inspectors probed the plaques and discovered a white powdery substance secreted inside them. When field tests

confirmed that the substance was co-caine, the inspectors arrested Mr. Ozuna. According to a subsequent laboratory report, the plaques contained 1.9 kilograms of cocaine.

After arresting Mr. Ozuna, the inspectors read him his *Miranda*[1] rights. Mr. Ozuna waived his rights and made an oral statement to agents from the Customs Service.

Mr. Ozuna told the agents that a woman named Ingrid Mendoza purchased his one-way airline ticket from Caracas, Venezuela, and gave him the plaques to transport. He had met Ms. Mendoza in February of 1999 and had an intimate relationship with her for several months. Ms. Mendoza maintained a residence in New York City, but at the time she was living in an apartment in Caracas.

According to Mr. Ozuna, Ms. Mendoza was a Hispanic female, approximately 38 years old, who stood 5'10" tall and had a strong build. She had a light brown complexion, dark brown eyes, and black shoulder-length hair. She had a scar on her stomach, and was the mother of two boys, 12 and 15 years old.

Mr. Ozuna provided the agents with his New York address. He told them that prior to visiting Venezuela, he lived in Santo Domingo, Dominican Republic, for approximately four months, where he worked as a carpet installer. Ms. Mendoza persuaded him to come visit her in Venezuela, and he arrived there on March 15, 2000. Ms. Mendoza paid all of his expenses for the visit, including travel, meals, clothes, and lodging.

Although he admitted that both he and Ms. Mendoza were under the influence of cocaine while he was in Venezuela, Mr. Ozuna said that his last consumption of cocaine was on March 16, 2000, two days prior to his return. He stated that he was transporting the plaques as a favor to Ms. Mendoza. He indicated that Ms. Mendoza had purchased souvenirs for him to bring back to the United States along with the two plaques and had instructed him to wrap the plaques with clothes so that they would not be damaged. He thought her request was strange because the plaques were large. Prior to departing, he knocked on the plaques to check if they were constructed of solid wood.

Ms. Mendoza told Mr. Ozuna that she or her associate would contact him when he arrived in New York. The plan was for Ms. Mendoza's associate to pick up the plaques, or, alternatively, for Mr. Ozuna to deliver them to another location. As the story goes, Mr. Ozuna, the plaques, and the cocaine never made it to New York.

## II. THE RULE 404(B) EVIDENCE

Mr. Ozuna was arrested in Maryland for possession of cocaine in 1995. He subsequently made post-arrest statements that are similar to the statements he made after his arrest in this case. Although Mr. Ozuna was ultimately not prosecuted in Maryland, the government seeks to introduce evidence regarding his 1995 arrest in its case-in-chief under Rule 404(b) in order to prove intent. Mr. Ozuna, on the other hand, contends that he was unlawfully detained in 1995, and argues that any evidence obtained as a result of that unlawful detention should be suppressed as fruits of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 485–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Before addressing the parties' arguments, I detail the facts concerning the 1995 incident as presented at the evidentiary hearing on September 22, 2000.

On August 5, 1995, at approximately 8:30 p.m., Maryland State Trooper Vincent Curry stopped a Greyhound bus headed southbound on Route 295 for speeding. After giving the bus driver a written warning and returning his driver's license and registration, Trooper Curry informed the driver that he was free to leave. Trooper Curry then obtained the driver's consent to board the bus and speak to the passen-

---

1. *Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

gers. As Trooper Curry entered the bus, which was approximately three quarters full, he made a general announcement over the intercom system. He identified himself as a Maryland state trooper and notified the passengers that he was checking for illegal substances, contraband, and guns. In a normal conversational tone, Trooper Curry asked the passengers if he could speak with them, and asked them for their cooperation in claiming their carry-on baggage. Trooper Curry did not tell the passengers that they could not leave the bus, nor did he inform them that they could refuse consent or leave. Trooper Curry was the only officer on the bus, and his gun was not drawn.

After making this general announcement, Trooper Curry made his way from the front of the bus to the back, speaking to each of the passengers. At this time he saw Mr. Ozuna slouched in his seat at the rear of the bus.

As he spoke to the passengers, Trooper Curry did not block the aisle, but rather stood to the side to permit the passengers to leave if they wished to do so. The first passenger to claim her baggage opened it, despite the fact that Trooper Curry did not ask her to do so. Other passengers followed suit, but Trooper Curry did not go through anyone's baggage. During this time, the bus door was open and the driver stood at the front of the bus.

After interacting with approximately 15 passengers, Trooper Curry noticed several things about Mr. Ozuna. First, Mr. Ozuna would not look directly at Trooper Curry, even though all of the other passengers were interested in Trooper Curry's actions. Second, Mr. Ozuna was moving around in his seat and appeared nervous. Third, Mr. Ozuna pulled his shirt out of his waistband and over his shorts. Trooper Curry approached Mr. Ozuna, who was sitting by himself in an aisle seat, and stood in front of him. Trooper Curry asked Mr. Ozuna to claim his bag and Mr. Ozuna complied. Mr. Ozuna unzipped his duffel bag and gave it to Trooper Curry, even though Trooper Curry did not ask

him to do so. Upon inspection, Trooper Curry found that the bag was empty, except for a one-way ticket from New York to Washington, D.C., and a tally sheet. Trooper Curry testified that based upon his experience, such tally sheets are used by drug couriers to account for debts owed on drug transactions.

When Trooper Curry asked Mr. Ozuna where he was going, Mr. Ozuna answered that he was traveling to Washington, D.C. During this encounter, Mr. Ozuna was nervous and would not look at Trooper Curry. According to Trooper Curry, Mr. Ozuna's hands were shaking and his voice showed signs of nervousness. Trooper Curry asked Mr. Ozuna to empty his pockets, and Mr. Ozuna complied. Trooper Curry then sought permission to conduct a pat-down search, and Mr. Ozuna responded "OK." Trooper Curry did not tell Mr. Ozuna that he had the right to refuse consent. In conducting the search, Trooper Curry felt a hard object, which he believed to be a package of cocaine or heroin, in Mr. Ozuna's shorts. The hard object was a five inch by five inch bag wrapped in tape. Trooper Curry placed Mr. Ozuna under arrest, but did not ask him any questions at that time. The package taken from Mr. Ozuna contained 476 grams of cocaine. *See* D.E.A. Reports, Government Exhibit 2 at 1 (August 8, 1995).

Trooper Curry was on the bus for about 2 minutes, and his encounter with Mr. Ozuna lasted approximately 15–20 seconds. After arresting Mr. Ozuna, Trooper Curry drove him to the barracks of the Maryland State Police, where he was fingerprinted and read his *Miranda* rights. Mr. Ozuna waived his rights verbally, and made a statement to Trooper Curry. Mr. Ozuna said that he was supposed to deliver the package to an unknown individual in Washington, D.C., at which time he was to receive a payment of $400.

On August 7, 1995, Officer Dan Nelson of the Maryland State Police interviewed Mr. Ozuna after he executed a waiver of rights form. *See* Waiver of Rights Form,

Government Exhibit 1 (August 7, 1995). Mr. Ozuna told Officer Nelson that he was from New York, where he worked as a hair stylist or barber. Mr. Ozuna said that he had met an individual nicknamed "Ice" at a party in the New York area. Mr. Ozuna stated that Ice came to his place of business, where Mr. Ozuna gave him a haircut. Mr. Ozuna told Ice that he and his girlfriend were expecting a baby, and that money was tight. Ice offered him an opportunity to make $400 for one day's work, and Mr. Ozuna agreed. Ice instructed Mr. Ozuna to arrive at a particular building in New York and wait for an unnamed individual to provide further instructions. When Mr. Ozuna arrived at the building, he met a man who asked him if he was "Ice's boy." Mr. Ozuna described the man as a 26–year–old black or Hispanic male, who stood 5′11″ tall, weighed approximately 170 pounds, and had medium-length hair and a short beard. Mr. Ozuna stated that he followed the unnamed man into the lobby area of the building, where the man retrieved a small package wrapped in brown plastic tape. The man instructed Mr. Ozuna to board a Greyhound bus at the 42nd Street bus station and take the 5:00 p.m. bus to Washington, D.C. The man gave Mr. Ozuna $100 for cab and bus fare, and told him that upon his arrival in Washington, D.C., he was to exit the bus, walk past the candy counter, and go through the exit doors. Mr. Ozuna was to wait for an unknown male in the parking lot, give the package to the him, collect the remaining $300, and then return to New York on another bus.

### III. RULE 404(B) EVIDENCE AND THE EXCLUSIONARY RULE

 In order to be admissible, Rule 404(b)[2] evidence must satisfy a 3–part test: (1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act; and (3) the evidence must pass the Rule 403 balancing test. *See United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir.1992) (*en banc*); *United States v. Maxwell*, 34 F.3d 1006, 1009 (11th Cir.1994). Rule 404(b) evidence is not limited to criminal convictions, but can consist of uncharged crimes, wrongs, or other acts. Indeed, evidence of an act for which a defendant was previously acquitted can be submitted under Rule 404(b). *See, e.g., United States v. Cavin*, 39 F.3d 1299, 1311 (5th Cir.1994).

The evidence from Mr. Ozuna's 1995 Maryland arrest for possession of cocaine easily meets the requirements of Rule 404(b). First, the evidence is relevant to the issue of knowledge, which Mr. Ozuna has placed at issue by claiming that he did not know the plaques contained cocaine. *See Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."); *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir.1998) (government may prove intent "by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue") (citation omitted). Second, the testimony presented by Trooper Curry and Officer Nelson at the evidentiary hearing is sufficient for a reasonable jury to find that Mr. Ozuna possessed cocaine in 1995. *See United States v. Hooshmand*, 931 F.2d 725, 736 (11th Cir.1991) ("[Rule 404(b)] evidence is admissible only if the jury

---

**2.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

could reasonably find by a preponderance of the evidence that the defendant committed the extrinsic act."). Third, the evidence passes the Rule 403 balancing test. *See United States v. Delgado,* 56 F.3d 1357, 1366 (11th Cir.1995) ("While the strength of the government's case regarding intent is important in comparing probative value and prejudice, '[t]he greater the government's need for evidence of intent, the more likely that the probative value will outweigh any possible prejudice.'") (citations omitted). Indeed, the similarity of the acts by Mr. Ozuna in 1995 and 2000 makes this a very strong case for the admission of Rule 404(b) evidence and ensures that the probative value of the evidence will not be substantially outweighed by its prejudicial effect. *See Huddleston,* 485 U.S. at 688–89, 108 S.Ct. 1496. In both instances, Mr. Ozuna was in possession of cocaine while traveling on a common carrier, and told the authorities after his arrest that, at the behest of a friend or acquaintance, he was going to deliver the item or items in question to someone he did not know at another destination.

Having concluded that the evidence from Mr. Ozuna's 1995 Maryland arrest satisfies Rule 404(b), I now turn to Mr. Ozuna's constitutional challenge. "The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." *Arizona v. Evans,* 514 U.S. 1, 10–11, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Although precedent from the former Fifth Circuit suggests that the admission of Rule 404(b) evidence is constrained by the Fourth Amendment, *see United States v. Renteria,* 625 F.2d 1279, 1282 (5th Cir. 1980) ("Unless barred by the Fourth Amendment challenge, th[e] [Rule 404(b)] evidence was properly admitted."), the Seventh and Tenth Circuits appear to be the only courts to have expressly addressed this issue.

In *United States v. Hill,* 898 F.2d 72, 74 (7th Cir.1990), the Seventh Circuit held that the constitutionality of a search from a prior arrest must be determined before admitting the fruits of that search against a defendant in a later trial under Rule 404(b). Notably, the Seventh Circuit concluded that an "independent finding concerning the constitutionality of the seizure" is required even if the same issue is currently being litigated in a state court. *Id.* at 74. Because the district court did not hold an evidentiary hearing, the Seventh Circuit remanded the case for a determination of whether the Rule 404(b) evidence was unconstitutionally obtained, and ordered a new trial if the search was found to have been unlawful. *See id.* at 76.

The Tenth Circuit took a similar approach in a case also entitled *United States v. Hill,* 60 F.3d 672 (10th Cir.1995). In that case, the Tenth Circuit ruled that the "exclusionary rule does apply where ... the alleged unlawfully obtained evidence is being used to prove an essential element of a charged offense—at least where there is some nexus between the initial search and seizure and the subsequent charged offense." *Id.* at 677. The Tenth Circuit explained that its approach was consistent with the Supreme Court's deterrence rationale and policy of protecting against a conviction predicated upon unconstitutionally obtained evidence. *See id.* The Tenth Circuit nevertheless concluded that even if the evidence had been unconstitutionally obtained, admitting the evidence under the particular facts of the case was "harmless beyond a reasonable doubt." *Id.* at 681.

■ In view of the *Hill* decisions from the Seventh and Tenth Circuits and the Former Fifth Circuit's suggestion in *Renteria,* I conclude that the exclusionary rule applies to Rule 404(b) evidence. Sheltering Rule 404(b) evidence from the exclusionary rule would open a back door to the admission of unconstitutionally obtained evidence and frustrate the policy of deterrence which underlies the rule. *See Illinois v. Rodriguez,* 497 U.S. 177, 183, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) ("What [a defendant] is assured by the

trial right of the exclusionary rule, where it applies, is that no evidence seized in violation of the Fourth Amendment will be introduced at his trial unless he consents."). Whether or not the exclusionary rule operates to preclude the admission of the Rule 404(b) evidence in this case is a separate question.

## IV. THE CHOICE OF LAW CONUNDRUM

■ Because a constitutional violation is a necessary predicate to invocation of the exclusionary rule, *see United States v. Thompson*, 936 F.2d 1249, 1251 (11th Cir. 1991), it appears that everything in this case boils down to whether the 1995 encounter between Trooper Curry and Mr. Ozuna was lawful. It is undisputed that Trooper Curry lawfully stopped the Greyhound bus for speeding and obtained the driver's consent to board the bus and speak to the passengers. *See Whren v. United States*, 517 U.S. 806, 819, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding that the constitutional reasonableness of a traffic stop depends on probable cause, and not on the subjective intentions of the police officer). Mr. Ozuna, however, argues that all of the passengers on the bus were seized, for Fourth Amendment purposes, from the moment Trooper Curry made his announcement over the intercom system. Because Trooper Curry did not have the necessary reasonable suspicion for such a seizure, Mr. Ozuna continues, his detention and arrest were unconstitutional.

### A. THE ALLEGED FOURTH AMENDMENT VIOLATION

The Fourth Amendment question entails a choice-of-law determination because the 1995 arrest took place in Maryland, a state within the jurisdictional boundaries of the Fourth Circuit, while this case is pending in a district within the Eleventh Circuit. *See generally United States v. Gerena*, 667 F.Supp. 911, 927 (D.Conn.1987) ("Like instrastate divisions, the division of the nation into circuits is an intrafederal jurisdictional scheme. To the extent that each circuit has its own body of binding precedent (uniformly regarded as binding only within defined jurisdictional limits) then, in the absence of authoritative Supreme Court disposition of the particular issue in question, differences among the circuits give rise to intrafederal disputes and thus genuine conflicts within the meaning of conflict of laws analysis, and require a choice to be made where the interests of the nonforum jurisdiction are significant."). Although the Supreme Court has spoken on the issue of bus interdictions and rejected a per-se rule that such encounters constitute Fourth Amendment seizures, *see Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Fourth and Eleventh Circuits have rendered decisions that seem to be in tension. *Compare United States v. Smith*, 201 F.3d 1317, 1320–21 (11th Cir.2000), *with United States v. Flowers*, 912 F.2d 707, 709–12 (4th Cir.1990). Because I find that there was no constitutional violation even under the apparently more demanding Eleventh Circuit precedent, it is unnecessary to engage in a choice-of-law determination at this stage of the analysis.

■ In *Bostick*, 501 U.S. at 439, 111 S.Ct. 2382, the Supreme Court ruled that the appropriate inquiry in bus interdiction cases is "whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." Eleventh Circuit cases after *Bostick* hold that, under certain circumstances, a police officer's boarding of a bus and asking for the cooperation of the passengers can constitute a seizure for Fourth Amendment purposes. Nevertheless, merely boarding a bus and asking questions "is not necessarily a seizure." *Smith*, 201 F.3d at 1321. *See also United States v. Washington*, 151 F.3d 1354, 1356 (11th Cir.1998); *United States v. Guapi*, 144 F.3d 1393, 1394–96 (11th Cir.1998). In *Smith* and *Washington*, for example, a number of facts collectively elevated the particular encounters to a Fourth Amendment seizure: the officers boarded the bus, made a general announcement asking for the passengers' cooperation, spoke in-

dividually with each passenger, did not inform the passengers of their right to refuse consent, asked for each passenger's ticket and identification, and requested each passenger to claim his or her luggage. *Smith,* 201 F.3d at 1320; *Washington,* 151 F.3d at 1357. *See also Guapi,* 144 F.3d at 1394 (officers asked for passengers' cooperation but did not inform passengers that they could refuse consent or leave, requested passengers to permit inspection of their luggage, and walked from front to back of bus). It is tempting to read these Eleventh Circuit cases as holding that a bus interdiction will constitute a seizure unless the passenger is told of his right to refuse consent, *see Washington,* 151 F.3d at 1357–58 (Black, J., dissenting), but the Eleventh Circuit has expressly disclaimed any such bright-line rule. *See, e.g., Smith,* 201 F.3d at 1321 ("A well-established principle of Fourth Amendment jurisprudence is that a seizure does not occur just because a police officer approaches a person and asks the person a few questions."). Thus, the question of seizure must be determined on an individualized basis, *see id.,* with the inquiry focusing on "whether [Trooper Curry's] conduct would have communicated to a reasonable person that [he] was not free to decline the ... requests or otherwise terminate the encounter," and not whether the bus passengers collectively felt free to refuse consent. *See Bostick,* 501 U.S. at 439, 111 S.Ct. 2382. *Cf. Rakas v. Illinois,* 439 U.S. 128, 133–134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that Fourth Amendment rights are personal and "may not be vicariously asserted"); *United States v. Sneed,* 732 F.2d 886, 888 (11th Cir.1984) (same).

■ Under the Eleventh Circuit's decisions in *Smith, Washington,* and *Guapi,* Mr. Ozuna was seized only when Trooper Curry asked him to claim his bag. Prior to that point, Trooper Curry's general announcement and interaction with other passengers would not have communicated to Mr. Ozuna that he was not free to decline any requests or otherwise terminate the encounter. That Trooper Curry seized Mr. Ozuna, however, does not end

the analysis, for the Fourth Amendment permits seizures that are reasonable. *Smith,* 201 F.3d at 1322–23.

■ At the time that he requested Mr. Ozuna to claim his bag, Trooper Curry had the requisite reasonable suspicion to effect a temporary investigative stop. *See United States v. Gordon,* 231 F.3d 750, 754 (11th Cir.2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."); *Smith,* 201 F.3d at 1322 (same). Four factors lead me to this conclusion. First, the bus was traveling from a source city for drugs, as Trooper Curry testified at the evidentiary hearing. Second, Mr. Ozuna averted his eyes from Trooper Curry as he was speaking to the passengers. Third, Mr. Ozuna appeared nervous. Fourth, and most importantly, Trooper Curry saw Mr. Ozuna pull his shirt out of his waistband and over his shorts. Viewed from a totality of the circumstances, Trooper Curry had a sufficient basis to briefly detain Mr. Ozuna. *See Gordon,* 231 F.3d at 754 ("A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.").

■ After Trooper Curry found the one-way ticket from New York and the tally sheet, he asked if Mr. Ozuna would consent to a pat-down search. Mr. Ozuna agreed. Upon conducting the search, Officer Curry found a package containing suspected contraband in Mr. Ozuna's shorts, and then placed Mr. Ozuna under arrest. Because Trooper Curry's initial seizure of Mr. Ozuna was reasonable under the Fourth Amendment, Mr. Ozuna's subsequent consent to the pat-down was not coerced or tainted. *Compare United States v. Drayton,* 231 F.3d 787, 788–91 (11th Cir.2000) (bus passengers' consent to search of their luggage was not free of coercion, and therefore subsequent pat-down search was tainted, where three officers boarded the bus, with one officer kneeling at the driver's seat in view of the

passengers and the other two speaking to the passengers individually; the officers displayed their badges and announced their intentions at a distance of 12–18 inches from the passengers; the officers explained that they were looking for drugs and weapons and asked the passengers if they had any bags on the bus; and the officers did not tell the passengers that they could refuse consent). It therefore follows that Mr. Ozuna's post-arrest statements to Trooper Curry and Officer Nelson, which were preceded by *Miranda* warnings and waivers, were not the result of any unlawful detention or arrest.

In sum, Mr. Ozuna's 1995 detention and arrest did not violate the Fourth Amendment, and the exclusionary rule therefore is not triggered. But even if I have read the *Guapi–Drayton* line of cases too narrowly, and Mr. Ozuna's consent can be said to be the product of coercion, exclusion of the Rule 404(b) evidence is still not warranted. *Cf. United States v. Verdugo–Urquidez*, 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) ("For purposes of this case, ... if there w[as] a [Fourth Amendment] violation, it occurred solely in Mexico. Whether evidence obtained from respondent's Mexican residences should be excluded at trial in the United States is a remedial question separate from the existence vel non of the constitutional violation.").

## B. The Remedy

■ If the law of the forum—i.e., Eleventh Circuit law—calls for the suppression of the Rule 404(b) evidence, then the choice-of-law issue alluded to earlier must be confronted. In contrast to *Guapi* and its progeny, which were decided after Mr. Ozuna's 1995 arrest, the Fourth Circuit's pre-*Bostick* decision in *Flowers* indicates that Trooper Curry's conduct was not coercive even though Mr. Ozuna was not

advised that he could refuse consent. *See Flowers*, 912 F.2d at 709–12 (bus passenger was not seized for Fourth Amendment purposes when two officers boarded the bus during a routine rest stop and initiated conversation with him, as officers were not threatening, asked passenger if they could speak with him, conversed in a casual tone of voice, and did not block aisle or otherwise physically prevent passenger from leaving his seat or exiting the bus).

■ The few federal cases that have addressed a similar choice-of-law issue in the criminal context have adopted a lex loci (i.e., the "law of the place" of the conduct) approach. *See, e.g., Gerena*, 667 F.Supp. at 927 ("Applying the principles that form the foundation of the ... lex loci approach, ... there is no logical basis for the conclusion that the forum should reward or punish the [g]overnment with either a more lenient or a more severe penalty than that proclaimed by the courts of the jurisdiction where the conduct occurred."); *United States v. Restrepo*, 890 F.Supp. 180, 191 (E.D.N.Y.1995) (noting, in dicta, approval of the lex loci approach of *Gerena* ). This approach is persuasive, and I adopt it in cases involving conflicts among the federal circuits.[3] Because the primary purpose of the exclusionary rule is to deter future police misconduct, Trooper Curry's encounter with Mr. Ozuna should be analyzed against the backdrop of Fourth Circuit law to determine whether the Rule 404(b) evidence should be suppressed. *See Restrepo*, 890 F.Supp. at 191 ("[S]uppression of evidence inadmissible in this circuit but admissible in [another circuit] would not deter misconduct of officers based in [the latter circuit]."); John Bernard Corr, *Criminal Procedure and the Conflict of Laws*, 73 GEO. L.J. 1217, 1234 (1985) (advocating a territorialist approach which applies the law of the jurisdiction where the

3. Given that states may provide more protections than those guaranteed by federal law, the choice-of-law issue becomes more complicated when a state court is asked to suppress evidence obtained in another state with a different constitutional provision and a differ-

ent exclusionary rule. *See generally* Mary Jane Morrison, *Choice of Law for Unlawful Searches*, 41 OKLA. L. REV. 579, 581–87, 615–32 (1988) (analyzing possible choice-of-law approaches).

police activity took place, and explaining that suppressing evidence under the forum's law will not deter police who have committed no wrong under the situs' law).

 As noted above, in light of Fourth Circuit precedent, Trooper Curry conducted himself in a reasonable and lawful manner when he approached, detained, and arrested Mr. Ozuna. Fourth Circuit law, in 1995 and as it stands today, expressly holds that a police officer may board a bus with the driver's permission and ask the passengers for their cooperation without effecting a Fourth Amendment seizure. *See United States v. Garcia*, 909 F.Supp. 334, 337 n. 2 (D.Md.1995) ("Although *Flowers* was decided before *Bostick*, the Fourth Circuit applied a 'totality of the circumstances' test that was subsequently adopted in *Bostick*. Thus, *Flowers* is still relevant precedent in the area of bus searches."). Exclusion of the Rule 404(b) evidence, which was obtained in compliance with Fourth Circuit law, would uproot the proverbial "poisonous tree." *See Jonas v. City of Atlanta*, 647 F.2d 580, 587 (5th Cir. Unit B 1981) ("For the rule to be applied, the deterrent benefit of exclusion must outweigh the public interest."); Akhil Reed Amar, THE CONSTITUTION AND CRIMINAL PROCEDURE 160 (1997) ("Criminal proceduralists must carefully attend to the ways that procedure can affect substantive enforcement policy for good or for ill."). *Cf. Illinois v. Krull*, 480 U.S. 340, 349–350, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (holding that the exclusionary rule does not apply when an officer reasonably relies upon a statute later found to be unconstitutional). Although I am not sure I completely agree with the nexus requirement as articulated by the Tenth Circuit in *Hill*, 60 F.3d at 679–80, I am confident that the exclusionary rule should not be applied under the circumstances presented here. *See, e.g., United States v. Nolan*, 551 F.2d

266, 273 (10th Cir.1977) (holding that a voluntary confession obtained by British authorities, albeit without the benefit of *Miranda* warnings, was nevertheless admissible under Rule 404(b) because the exclusionary rule has little or no deterrent effect on alleged foreign police misconduct).[4]

## V. CONCLUSION

For the reasons set forth above, Mr. Ozuna's motion to suppress the Rule 404(b) evidence from his 1995 arrest in Maryland for possession of cocaine is denied.

---

4. Maryland law on bus interdictions is consistent with Fourth Circuit law, *see Stanberry v. State*, 343 Md. 720, 684 A.2d 823, 832 (1996), and therefore my conclusion would remain the same even if I looked to Maryland law to evaluate Trooper Curry's actions. *Cf. Lathers v. United States*, 396 F.2d 524, 529 (5th Cir. 1968) ("The choice of law guide ... which is most often expressed, certainly in this circuit, is that in the absence of a specific federal arresting statute state law determines the legality of state arrests.").